**Van Lee BREWER, et al., Plaintiffs,**

**Van Lee Brewer and Claude Harris, Plaintiffs–Appellants,**

v.

**B. WILKINSON, et al., Defendants– Appellees.**

No. 92–1718.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1993.

Van Lee Brewer, pro se.

Claude Harris, pro se.

Louis Victor Carrillo, Asst. Atty. Gen., Dan Morales, Atty. Gen., Austin, TX, for defendants-appellees.

Before KING, HIGGINBOTHAM and DEMOSS, Circuit Judges.

KING, Circuit Judge:

Texas Department of Criminal Justice inmates Van Lee Brewer and Claude Harris brought this § 1983 civil rights action against the mail-room supervisor and a mail-room clerk at TDCJ's Price Daniel Unit, alleging constitutional violations arising from the handling of their mail. Concluding that the inmates had failed to state a cognizable constitutional claim for denial of access to the courts, the district court granted the Appellees' motion for summary judgment and dismissed the action. Brewer and Harris appeal. We affirm in part and reverse in part the judgment of the district court.

## I. BACKGROUND

Proceeding *pro se* and *in forma pauperis,* Texas Department of Criminal Justice (TDCJ) inmates Van Lee Brewer and Claude Harris (Appellants) filed this § 1983 civil rights action against Brenda Wilkinson and several other unnamed employees of the mailroom at the TDCJ Price Daniel Unit (Appellees) seeking money damages for alleged violations of the Appellants' constitutional rights. Specifically, Appellants allege

that Appellees violated their constitutional rights by opening incoming legal mail from various courts, attorneys, and government officials and inspecting it for contraband outside of their presence. Brewer complains that thirteen such items of incoming legal mail were opened and inspected outside of his presence between January 1990 and March 1991; Harris complains of one such instance, which allegedly occurred on November 15, 1990.[1] Appellants contend that Appellees' conduct infringed upon their First Amendment rights and their right of access to the courts, which is protected by the First and Fourteenth Amendments.

According to Appellants, the Appellees' acts with regard to their incoming legal mail "denied [Appellants'] [right] to be free from arbitrary and unjustified governmental interference [and] denied [Appellants'] rights to have 'confidential communications' with the Courts and Attorneys." Appellants do not, however, specifically allege that Appellees censored their incoming legal mail.

Appellants also allege constitutional violations arising from the handling of their nonlegal mail. Brewer complains that, on "numerous" occasions, incoming and outgoing correspondence with his wife was not delivered. Harris complains that ten specific items of incoming general correspondence were intentionally "withheld" for over seventy-two hours before delivery. According to Appellants, these actions violated their rights under the First and Fourteenth Amendments. Appellants further allege that Appel-

lees' handling of their mail, legal and nonlegal, violated TDCJ correspondence rules.[2]

Wilkinson filed an answer in which she denied Appellants' allegations and raised the defense of qualified immunity. Wilkinson also moved to dismiss the action on the grounds that Appellants' claims against her in her official capacity were barred by the Eleventh Amendment, that Appellants had failed to plead facts sufficient to overcome her plea of qualified immunity, and that Appellants had failed to state a cognizable claim for violation of any constitutionally protected right. The district court then referred the matter to a magistrate, who permitted Appellants to supplement their complaint in response to Wilkinson's plea of qualified immunity.

After considering Wilkinson's motion in light of the supplemental pleading, the magistrate issued proposed findings, conclusions, and recommendations, in which he concluded that Appellants' allegations regarding the opening of incoming legal mail stated a claim for "a violation of a clearly established law." The magistrate therefore found that Appellants had pleaded facts that, if proven, would be sufficient to overcome Wilkinson's claim of qualified immunity. Accordingly, the magistrate recommended that Appellants be allowed to proceed with their action. Wilkinson objected, and, after a *de novo* review of the record, the district court adopted the magistrate's report and scheduled the case for trial.[3]

1. The Appellants' pleadings specify the precise items of legal mail and the approximate dates on which the alleged unauthorized opening occurred.

2. The TDCJ correspondence rules provide that "[a]s a general proposition, all incoming and outgoing correspondence, except as otherwise provided here, is subject to delivery, inspection, and rejection in accordance with the following rules[.]" Under the Rules, mail addressed to and received from courts and public officials constitutes "Special Correspondence." *See* Rule 3.9.2. The Rules provide: "All outgoing Special Correspondence shall be sent sealed and uninspected whether or not addressed to a specific named official. Incoming Special Correspondence from a specific named official will be delivered to the inmate sealed and uninspected. Incoming Spe-

cial Correspondence not from a specific named official may be opened and inspected for contraband only. The inspection shall be in the inmate's presence." Rule 3.9.2.1. With respect to "General Correspondence," the Rules provide, *inter alia*, that mail may be rejected only if it falls into one of several enumerated categories of offending material, Rule 3.9.1.6, that incoming mail will be delivered within forty-eight hours, except on weekends or holidays when seventy-two hours is allowed, and outgoing mail will be delivered to a U.S. Postal Officer within the same time periods, Rule 3.9.1.7, and that all mail, whether incoming or outgoing, "shall be handled with all reasonable dispatch," Rule 3.9.1.9.

3. Neither the magistrate nor the district court mentioned the inmates' claims regarding nonlegal mail.

Wilkinson subsequently moved for summary judgment. Wilkinson argued that she was entitled to judgment as a matter of law on Appellants' access-to-the-courts claim because Appellants had alleged no actual prejudice or harm resulting from Appellees' conduct. Wilkinson also reasserted her Eleventh Amendment and qualified immunity defenses. Appellants responded to Wilkinson's motion and, with the permission of the court, amended their complaint, adding C. Calloway, a mail-room clerk, as a named defendant, adding allegations that Appellees' conduct had caused Appellants "mental and emotional distress," and dropping all claims against Appellees in their official capacities. The Amended Complaint also added an allegation by Brewer that Calloway had opened two items of *outgoing—as opposed to incoming*—legal correspondence and, at least with respect to one of those mailings, removed a "writ of mandamus," thereby not "allow[ing] the Court to receive said materials."[4] According to Brewer, Calloway's conduct infringed upon his right of access to the courts and his First Amendment right of free speech. Calloway filed a timely answer, in which she raised the defense of qualified immunity, and joined in the pending motion for summary judgment.

On August 10, 1991, the district court granted Appellees' motion for summary judgment as to all of Appellants' claims. In granting the motion, the court first concluded that Appellees were not entitled to summary judgment on the issue of qualified immunity. The court reasoned that prisoners have a constitutionally protected right of access to the courts, and that this court, in *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir.1978), had established, as a corollary of this right of access, the right of TDCJ prisoners to have legal mail opened and inspected only in their presence. The district court therefore found that Appellants had alleged "a violation of a clearly established constitutional right" and concluded that Appellees were not entitled to qualified immunity as a matter of law because the summary judgment evidence raised

a fact issue as to whether Appellants' legal mail in fact had been opened outside of their presence.

Notwithstanding its conclusion that Appellants had alleged a violation of a clearly established constitutional right, the district court then concluded that summary judgment was proper because Appellants had failed to make out a cognizable constitutional claim. Following *Henthorn v. Swinson*, 955 F.2d 351 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2974, 119 L.Ed.2d 593 (1992), the court held that "a denial-of-access-to-the-courts claim is not valid if a litigant's position is not prejudiced by the alleged violation." The court reasoned, therefore, that Appellees were entitled to summary judgment because "none of [the Appellants] have alleged any harm or prejudice resulting to them because of the alleged misconduct on the part of Appellees in handling their legal mail." Thus, without ever expressly addressing Appellants' other constitutional claims, the district court granted summary judgment in favor of Appellees and dismissed the case. This appeal ensued.

## II. STANDARD OF REVIEW

Proceeding on appeal *pro se,* Appellants argue that the district court erred in granting summary judgment. Specifically, Appellants challenge the district court's conclusion that they failed to make out a cognizable claim for denial of their right of access to the courts. Appellants also argue that the district court improperly dismissed their other First and Fourteenth Amendment claims.

■■■■■ We review the district court's grant of summary judgment *de novo,* applying the same standard as a district court. *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). Summary judgment is proper only if the record discloses that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Harbor Ins. Co. v. Trammell Crow Co.,* 854 F.2d 94, 98

---

**4.** Actually, as we read Brewer's complaint, the two items of outgoing mail are an original and a copy of the same legal document. Both were allegedly mailed on November 19, 1991. The copy allegedly mailed to the clerk of the district court was an item of Brewer's outgoing mail that was allegedly never received by the court because of Appellee Calloway's interference.

(5th Cir.1988) (quoting FED.R.CIV.P. 56(c)), *cert. denied,* 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989). Moreover, in reviewing the record, we are not bound to the grounds articulated by the district court for granting summary judgment, for we may affirm the judgment on other appropriate grounds. *Harbor Ins. Co. v. Urban Constr. Co.,* 990 F.2d 195, 199 (5th Cir.1993); *Coral Petroleum, Inc. v. Banque Paribus–London,* 797 F.2d 1351, 1355 n. 3 (5th Cir.1986); *see also Davis v. Liberty Mut. Ins. Co.,* 525 F.2d 1204, 1207 (5th Cir.1976).

## III. QUALIFIED IMMUNITY

■ Although the district court concluded that Appellees were not entitled to summary judgment on the issue of qualified immunity, we review that conclusion here because the determination of such immunity is a threshold question which must be resolved inasmuch as it determines a defendant's immunity from suit rather than merely immunity from damages. *See Siegert v. Gilley,* —— U.S. ——, —— – ——, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991); *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1982).

■ To determine whether a defendant official is entitled to qualified immunity, a court must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right. *Siegert,* —— U.S. at ——, 111 S.Ct. at 1793; *see Correa v. Fischer,* 982 F.2d 931, 933 (5th Cir.1993); *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992). If the plaintiff has asserted the violation of a constitutional right, the court must then determine whether that right had been clearly established so that a reasonable official in the defendant's situation would have understood that his conduct violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *cf. Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738. Thus, in analyzing whether the Appellees are entitled to qualified immunity, we must first address whether Appellants have set forth any cognizable constitutional claims.

## IV. PRISONERS' LEGAL MAIL CLAIMS

Before we can address whether the Appellants have asserted any cognizable constitutional claims, however, we must examine in detail the rights which Appellants allege have been violated. We must also specifically examine the extent to which a prison regulation or practice may constitutionally impinge upon those rights.

### A. Rights Involved in Legal Mail Claims

■ A prison official's interference with a prisoner's legal mail may violate the prisoner's constitutional right of access to the courts. Additionally, such interference may violate the prisoner's First Amendment right to free speech—i.e., the right to be free from unjustified governmental interference with communication. We examine each of these rights in turn.

### 1. Right of Access to the Courts

It is clearly established that prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); *see also Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). The Supreme Court has stated that this right of access "is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff,* 418 U.S. at 579, 94 S.Ct. at 2986; *see also Martinez,* 416 U.S. at 419, 94 S.Ct. at 1814. The Supreme Court has also viewed the right of access to the courts as one aspect of the First Amendment right to petition the government for grievances. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609,

611, 30 L.Ed.2d 642 (1972).[5] While the precise contours of a prisoner's right of access to the courts remain somewhat obscure,[6] the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court. *See Wolff,* 418 U.S. at 576, 94 S.Ct. at 2984; *see also Martinez,* 416 U.S. at 419–22, 94 S.Ct. at 1814–15 (determining that the right of access to the courts prohibits prison officials from unreasonably limiting an inmate's access to legal personnel who can provide essential legal advice); *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498 (describing the right of access to the courts as requiring prison officials to provide prisoners with adequate law libraries or assistance from trained legal personnel); *cf. Houston v. Lack,* 487 U.S. 266, 270–76, 108 S.Ct. 2379, 2382–85, 101 L.Ed.2d 245 (1988) (noting that prison authorities cannot take actions which delay the mailing of an inmate's legal papers when such a delay effectively denies the inmate's access to the courts).

## 2. Right to Free Speech

The precise contours of a prisoner's right to free speech are also obscure. The Supreme Court has made it clear, however, that prisoners retain only those First Amendment rights of speech which are "not inconsistent with [their] status as ... prisoner[s] or with the legitimate penological objectives of the corrections system." *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). The Court has also made it clear that a prisoner's freedom from censorship under the First Amendment's guarantee of free speech with regard to his incoming mail is not the equivalent of freedom from inspection or perusal. *Wolff,* 418 U.S. at 576, 94 S.Ct. at 2984.

**B.** The Extent to Which a Prison Regulation or Practice May Impinge Upon Prisoners' Rights With Respect to Legal Mail

■ As the above discussion indicates, prisoners' constitutional rights with respect to legal mail are not absolute. That is, under some circumstances, a prison practice or regulation may, consistently with the constitution, interfere with inmates' legal mail. The following discussion traces Supreme Court and Fifth Circuit cases dealing with prisoner mail, in an effort to determine the extent to which prison officials may interfere with a prisoner's legal mail without offending his constitutional rights.

Of course, a prisoner's claim that interference with his legal mail violated his right of access to the courts is distinct from his claim that such conduct violated his right to free speech. However, because the jurisprudence governing each of these claims has become inextricably intertwined, our discussion includes cases involving access to the courts challenges, as well as cases involving only free speech challenges, to prison practices or regulations that interfere with the ability of prisoners to send or receive mail.

### 1. *Procunier v. Martinez*

We begin with the Supreme Court's decision in *Martinez,* in which the Court invalidated a prison regulation that permitted the censoring of non-legal prisoner mail. In so doing, the Court made it clear that it was basing its inquiry on a somewhat different analytical framework than other federal courts had in previously considering the proper standard of review for constitutional challenges to censorship of prisoner mail. *Martinez,* 416 U.S. at 408, 94 S.Ct. at 1808. Although other courts had dealt with such challenges by inquiring into broad questions of prisoners' rights, the Court emphasized that such an inquiry was unnecessary in *Martinez* because "the First Amendment liberties of *free citizens* are implicated in cen-

---

**5.** This court has likewise recognized the relationship between the First Amendment and the constitutional right of "access to the courts." *See, e.g., Taylor v. Sterrett,* 532 F.2d 462, 470–72 (5th Cir.1976).

**6.** *See Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir.1985) ("Perhaps because their textual footing in the Constitution is not clear, these principles suffer for lack of internal definition and prove far easier to state than to apply.").

sorship of prisoner mail." *Id.* at 409, 94 S.Ct. at 1809 (emphasis added). Thus, the Court reasoned that, because of these First Amendment implications of censoring prisoner mail, any such regulation had to be based on an "important or substantial governmental interest unrelated to the suppression of expression" and could not limit First Amendment freedoms any greater than "necessary" to protect the particular governmental interest involved. *Id.* at 413, 94 S.Ct. at 1811.

### 2. *Wolff v. McDonnell*

Shortly after deciding *Martinez*, the Court in *Wolff* addressed the narrow issue of whether prison authorities could open letters to an inmate from attorneys in the inmate's presence or whether such mail had to be delivered unopened "if normal detection techniques fail to indicate contraband." *Wolff*, 418 U.S. at 575, 94 S.Ct. at 2984.[7] Prisoners had asserted that their rights under the First and Fourteenth Amendments would be violated if prison procedure permitted the opening of their incoming legal mail.[8] *Id.* The Court began its analysis by recognizing that the constitutional status of the rights asserted by the prisoners, as applied in the instant situation, was "far from clear." *Id.*

In initially reviewing the prisoners' free speech claim, the Court noted that the "rights of correspondents with prisoners may protect against the censoring of inmate mail, when not necessary to protect legitimate governmental interests." *Id.* (citing *Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). The Court also pointed out, however, that it had yet to recognize First Amendment rights of prisoners in that context. *Id.* The Court further emphasized that "freedom from censorship is not equivalent to freedom from inspection or perusal." *Id.* 418 U.S. at

576, 94 S.Ct. at 2984. Moreover, in reviewing the prisoners' Fourteenth Amendment claim, based on the right of access to the courts, the Court explained that it had not extended that right "to apply further than protecting the ability of an inmate to prepare a petition or complaint." *Id.* Without deciding which of the asserted rights was operative in the instant case, the Court determined that neither of these rights was unconstitutionally infringed by the procedures to which prison officials had acceded. *Id.* at 576–77, 94 S.Ct. at 2984–85. Thus, the court emphasized that "by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, [prison officials] have done all, *and perhaps even more*, than the Constitution requires." *Id.* at 577, 94 S.Ct. at 2985 (emphasis added).

### 3. *Taylor v. Sterrett*

In the wake of the Supreme Court's decisions in *Martinez* and *Wolff*, this court decided *Sterrett*, which served as the basis for our decision in *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir.1978), on which Appellants chiefly rely. Although *Martinez* dealt chiefly with the censorship of non-legal prisoner mail and *Sterrett* essentially involved an access-to-the-courts claim with respect to legal mail, the *Sterrett* court relied upon the reasoning in *Martinez* for the core of its analysis. *See Sterrett*, 532 F.2d at 464–70, 477, 480.

In *Sterrett*, county officials challenged the constitutional basis for restrictions imposed by the district court upon the opening of prisoner mail in the Dallas County Jail. *See Sterrett*, 532 F.2d at 464. Specifically, the officials challenged a court order which, among other things, required the sheriff to open legal mail only in the presence of the prisoners and, even then, only if there was a

---

**7.** The prison regulation originally being challenged in *Wolff* provided that prison officials would inspect and read all incoming and outgoing mail. *See Wolff*, 418 U.S. at 574, 94 S.Ct. at 2983. The regulation made no exception for attorney-inmate mail. *Id.* During the course of the litigation, however, prison officials acceded to a rule whereby they could not open and read incoming attorney-inmate mail, but maintained that they could open all such mail as long as it was done in the inmate's presence. *Id.* at 575, 94 S.Ct. at 2984.

**8.** The prisoners had also asserted that their rights under the Sixth Amendment would be violated, an assertion the Court did not further address in light of the Court's determination that the Sixth Amendment only protected "the attorney-client relationship from intrusion in the criminal setting, while the claim here would insulate all mail from inspection, whether related to civil or criminal matters." *Wolff*, 418 U.S. at 576, 94 S.Ct. at 2984 (citations omitted).

reasonable probability that the mail contained contraband. *Id.* The *Sterrett* court concluded that, with the exception of the reasonable probability of contraband requirement, the restrictions were "compelled by the constitutional rights of the prisoners." *Id.* at 469.

In particular, *Sterrett* holds that a prisoner's right of access to the courts requires that incoming legal mail be opened only in the prisoner's presence. *Id.* at 475. In so holding, the court observed:

> The basic prisoner interest is in uninhibited communication with attorneys, courts, prosecuting attorneys, and probation or parole officers. Both pre-trial detainees and convicted prisoners have a vital need to communicate effectively with these correspondents. This is to insure ultimately that the judicial proceedings brought against or initiated by prisoners are conducted fairly.

*Id.*

Using *Martinez* as its foundation, the *Sterrett* court based its holding on its analysis of the restrictions imposed by the district court on the opening of incoming legal mail. The *Sterrett* court thus asserted that "[b]efore procedures that impede a prisoner's access to the courts may be constitutionally validated, it must be shown that the state's substantial interests cannot be protected by less restrictive means." *Sterrett,* 532 F.2d at 472. The *Sterrett* court then explained that it had taken the Supreme Court's use of the term "necessary" in *Martinez* to mean that a court reviewing the constitutionality of a prison

regulation should uphold the regulation if no alternative means of protecting prison security were reasonably available to prison officials. *Id.* at n. 14. Thus, the *Sterrett* court determined that prison procedures which impeded a prisoner's access to the courts could not be constitutionally validated unless it was clear that the state's substantial interests in those procedures could not be protected by "less restrictive means." *Id.* at 472.

### 4. *Turner v. Safley* and *Thornburgh v. Abbott*

*Sterrett's* requirement of the "least restrictive means" and a "substantial or important governmental interest" in the context of prison regulation of legal mail appears to have been modified. In *Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 1881–82, 104 L.Ed.2d 459 (1989), the Supreme Court overturned *Martinez's* holding regarding *incoming* mail, expressly limiting *Martinez* to *outgoing* prisoner mail. At issue in *Thornburgh* was the constitutionality of federal prison regulations which authorized wardens, pursuant to specified criteria, "to reject incoming publications found to be detrimental to institutional security." *Thornburgh,* 490 U.S. at 403, 109 S.Ct. at 1876. The Court in *Thornburgh* specifically held that the prevailing test regarding the impingement of a prison regulation on prisoners' constitutional rights—one which focused on whether the regulation was "reasonably related to a legitimate penological interest," *see Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)—should apply to prison regulations of incoming mail.[9] *See id.* 490

---

**9.** We note that the *Thornburgh* Court, in determining that *Turner's* "reasonableness" standard applied to the issue before it, explained that it was improper to focus on the "identity of the individuals whose rights allegedly have been infringed." *Thornburgh,* 490 U.S. at 410 n. 9, 109 S.Ct. at 1880 n. 9. The Court pointed out that although *Martinez* had taken special note of the fact that the rights of "outsiders" were at issue and *Turner* had enunciated a standard for circumstances in which prison regulations or practices allegedly infringed on a prisoner's constitutional rights, the cases on which the Court expressly relied in *Turner* all involved regulations or practices which restricted the constitutional rights of both prisoners and "outsiders." *Id.* (citing *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (involving the right

of publishers to send hardback books to prisoners); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (involving the right of a prisoner's union to send union literature to prisoners); and *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (involving the right of media representatives to conduct interviews with prisoners so as to keep the public informed about prison conditions)). The Court emphatically pointed out that in none of these cases was a heightened scrutiny standard applied. *Id.* Thus, the *Thornburgh* Court stressed *Turner's* mandate that even though prison regulations or practices might burden the fundamental rights of "outsiders," the proper inquiry was whether the regulation or practice in question was reasonably related to legitimate penological objectives. *Id.*

U.S. at 419, 109 S.Ct. at 1884. In *Turner*, the Court had held that, as a general matter, a prison regulation or practice which directly affected a prisoner's constitutional rights, including First Amendment rights, was valid as long as the regulation or practice was "reasonably related to a legitimate penological interest." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261. Thus, using *Turner*'s test, as opposed to the test enunciated in *Martinez*, the *Thornburgh* Court determined that the regulations in question, which allowed censorship of incoming mail, were facially valid.

Furthermore, the *Thornburgh* Court made it clear that *Martinez* was not to be read as requiring a "least restrictive means" test to determine the constitutional validity of prison officials' decisions. *Thornburgh*, 490 U.S. at 411, 109 S.Ct. at 1880. The Court, after noting that *Martinez* required "a close fit" between the challenged regulation and the state's interest in such a regulation, emphasized that

a careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case—outgoing personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security.

*Id.*[10] Although the Court appeared to draw a distinction between incoming and outgoing mail and to preserve the viability of *Martinez* with respect to outgoing mail, its "reading" of *Martinez* in *Thornburgh* suggests that *Turner*'s "legitimate penological interest" test would also be applied to outgoing mail.

### 5. Prisoners' Mail Claims After *Turner* and *Thornburgh*

■ The Court's decision in *Thornburgh* appears to us to have invalidated the reading of *Martinez* which the *Sterrett* court had given it. In adopting *Turner*'s "legitimate penological interest" standard of review for constitutional challenges to prison regulations or practices,[11] *Thornburgh* must be read as modifying *Sterrett* and its progeny, including *Guajardo*, in regard to prison regulations or practices which deal with prisoner mail. That is, in determining the constitutional validity of prison practices that impinge upon a prisoner's rights with respect to mail, the appropriate inquiry is whether the practice is reasonably related to a legitimate penological interest. *See Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir.1989) (noting that when this court deals with a challenge to an action taken by prison officials rather than to a regulation, the *Turner* reasonableness standard is applicable to determine whether that action was constitutionally permissible).

The only distinction that can be made regarding these cases is that *Martinez* and *Thornburgh* involved purely First Amendment free speech concerns while *Sterrett* focused on an access-to-the-courts claim, a claim grounded in both the First and Four-

10. The Court in *Turner* had also explained that, in determining whether the existence of ready alternatives evidenced the unreasonableness of a prison regulation or practice, a court was not to employ a "least restrictive means" test. *See Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. Thus, prison officials would not have to eliminate all other conceivable alternatives to accommodating a prisoner's constitutional right in formulating a prison regulation or policy that passed constitutional muster. *Id.*

11. Interestingly, the *Sterrett* court found unpersuasive the county officials' argument that "opening correspondence in an inmate's presence creates an onerous administrative burden." *Sterrett*, 532 F.2d at 473 n. 16. Although nothing in the record indicated that costs to administer the mail system had increased since the district court ordered all incoming legal mail to be opened only in the inmate's presence, the *Sterrett* court seemed convinced that a justification for a prison regulation or practice which was grounded in the cost of remedial measures would carry little weight when a burden on a fundamental right was involved. *Id.*

However, the Supreme Court in *Turner* specifically listed "the impact accommodation of the asserted constitutional right [would] have ... on the allocation of prison resources generally" as a factor in determining the reasonableness of a prison regulation or practice and hence its constitutional validity. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262 (also acknowledging that few changes would have no effect on the use of a prison's "limited resources for preserving institutional order" and that thus "courts should be particularly deferential to the informed discretion of corrections officials").

teenth Amendments. We view that distinction, however, as not controlling in light of (1) *Turner*'s instruction that when a prison practice impinges on inmates' constitutional rights, whatever those rights might be, such a practice is valid if it is "reasonably related to legitimate penological interests" and (2) the First Amendment implications inherent in both a free speech claim and an access-to-the-courts claim. With the foregoing framework in mind, we now analyze Appellants' legal mail claims.

## V. APPELLANTS' INCOMING LEGAL MAIL CLAIMS

■■■ Appellants allege that Appellees opened Appellants' incoming legal mail and inspected it for contraband outside of their presence, in violation of TDCJ rules and thus their rights of access to the courts and free speech. They do not assert, however, that their ability to prepare or transmit a necessary legal document has been affected by this opening and inspection. Nor do they allege that their mail has been censored. Furthermore, they concede that such mail was opened and inspected for the "legitimate penological objective" of prison security, i.e., to detect contraband.

■■■ In light of our discussion in Part IV, *supra*, we thus acknowledge that what we once recognized in *Sterrett* as being "compelled" by prisoners' constitutional rights— i.e., that a prisoner's incoming legal mail be opened and inspected only in the prisoner's presence, *see Sterrett*, 532 F.2d at 469—is no longer the case in light of *Turner* and *Thornburgh*.[12] Accordingly, we must also hold that the violation of the prison regulation requiring that a prisoner be present when his incoming legal mail is opened and inspected is not a violation of a prisoner's constitutional rights.[13] The Appellants, therefore, have not

stated a cognizable constitutional claim either for a denial of access to the courts or for a denial of their right to free speech by alleging that their incoming legal mail was opened and inspected for contraband outside their presence. We affirm the district court's grant of summary judgment regarding Appellants' claims involving incoming legal mail on the basis that the Appellants have failed to state a constitutional claim, and the Appellees are therefore entitled to qualified immunity. *See supra* Part II.

## VI. APPELLANT BREWER'S OUTGOING LEGAL MAIL CLAIMS

■■■ Appellant Brewer's claim regarding *outgoing* legal mail poses a different question. Brewer alleges that Appellee Calloway and unnamed others opened and removed material from an outgoing item of legal mail, thereby preventing a "writ of mandamus" from ever arriving in the district court and thus violating his rights of free speech and access to the courts.

We must first emphasize that the Supreme Court in *Thornburgh* made it clear that a distinction still exists between incoming prison mail and outgoing prison mail. *See Thornburgh*, 490 U.S. at 413, 109 S.Ct. at 1881. But that distinction revolves around the differing penological concerns with respect to outgoing and incoming mail. Specifically, the Court recognized that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Id.*

We believe that Appellant Brewer has set forth a cognizable First Amendment claim with respect to his outgoing legal mail. By alleging that Appellee Calloway and others arbitrarily opened an item of his outgoing

---

12. We must also point out that at issue in *Sterrett* and its progeny was the constitutionality of prison regulations or practices which were engendered as prophylactic measures in the wake of *Martinez*'s emphasis on the First Amendment rights of *correspondents* with prisoners—an emphasis which the Supreme Court abandoned in cases after *Martinez*. *See Thornburgh*, 490 U.S. at 410 n. 9, 109 S.Ct. at 1880 n. 9; *Turner*, 482 U.S. at 87, 107 S.Ct. at 2260.

13. As it happens, in a pre-*Martinez* case this court determined that the opening and inspecting of incoming *attorney*-inmate mail without censorship does not deny *any* federally-protected right that a prisoner has. *See Frye v. Henderson*, 474 F.2d 1263, 1264 (5th Cir.1973). *Frye* has thus come full circle.

legal mail and removed the "writ of mandamus" therein, thus preventing this document from ever arriving in the district court, Brewer has sufficiently alleged that his outgoing legal mail was "censored," apparently without a legitimate penological interest. No one has suggested—and Appellant Brewer has not conceded—that some legitimate penological interest justified the alleged removal of legal material. We additionally stress that for decades this court has acknowledged a prisoner's right to be free from completely arbitrary censorship of his outgoing mail, *see Sterrett*, 532 F.2d at 469; *Guajardo*, 580 F.2d at 753–59, a right of which prison officials in the Appellees' position should have been aware.

We also believe that Appellant Brewer has stated a cognizable constitutional claim for a denial of his right of access to the courts. By claiming that the actions of Calloway and others prevented his "writ of mandamus" from arriving at the district court, Brewer has sufficiently alleged the element of legal prejudice, as required by this court in *Henthorn*, that is necessary to set forth a cognizable access-to-the-courts claim. Moreover, that a prisoner's right of access to the courts includes his ability to prepare and transmit a necessary legal document to a court has been clearly established for decades. *See, e.g., Wolff*, 418 U.S. at 576, 94 S.Ct. at 2984. A prison official in Appellee Calloway's position thus should have been aware that arbitrarily preventing a necessary legal document from arriving in court would violate that right.

We therefore reverse the district court's grant of summary judgment regarding Appellant Brewer's outgoing legal mail claims. As explained, Brewer has asserted the violation of clearly established constitutional rights of which a reasonable prison official should have known. We remand for further proceedings.

## VII. CONCLUSION

We conclude that the district court properly granted summary judgment with respect

to Appellants' claims against the Appellees arising from the opening and inspection of their incoming legal correspondence outside of their presence. We further conclude, however, that the district court erred in granting summary judgment with respect to Appellant Brewer's claims concerning his outgoing legal mail. We also believe that, on remand, the district court should address the merits of the Appellants' remaining claims [14] that were ignored in the district court's order granting summary judgment for the Appellees. We therefore AFFIRM in part and REVERSE in part the judgment of the district court and REMAND the action for further proceedings consistent with this opinion.

---

14. Those claims are that (1) legal mail was wrongly withheld from the Appellants for over seventy-two hours, the maximum period which mail could be withheld under prison regulations; (2) incoming non-legal mail was never received

by the Appellants; (3) outgoing non-legal mail was never received by the addressees; and (4) numerical limits were placed on the Appellants' outgoing mail.