Craig WILLIAMS, Terrance Williams, Harold Wilson, Mumia Abu Jamal, Robert Wharton, Ronald F. Gibson, Leroy Thomas, Robert Atkins, James Dennis, Robert P. Dehart, and All Plaintiffs, Plaintiffs,

v.

James L. PRICE, in his official capacity as Superintendent of the State Correctional Institution at Greene; and Martin Horn, in his official capacity as Commissioner of the Pennsylvania Department of Corrections; Defendants.

No. CIV.A. 95–338.

United States District Court,
W.D. Pennsylvania.

Oct. 16, 1998.

Jere Krakoff, Pittsburgh, PA.

Kemal Alexander Mericli, Deputy Attorney General, Pittsburgh, PA.

*OPINION*

SENSENICH, United States Magistrate Judge.

On January 12, 1998 a report and recommendation was filed, recommending that Plaintiffs' Motion for Summary Judgment be granted and that Defendants' Motion for Summary Judgment be denied. It was further recommended that a judgment be entered declaring that Defendants had deprived Plaintiffs of their right to freedom of speech under the First Amendment of the

United States Constitution and their right to privacy under the Fourteenth Amendment by failing to provide them with a place where they could have private conversations with counsel without being overheard by others. It was further recommended that an injunction be entered directing Defendants to provide Plaintiffs with a place where they could have private conversations with counsel without being overheard by others.

On March 9, 1998 the Honorable Alan N. Bloch entered an order adopting the report and recommendation as the opinion of the court. Subsequently Defendants filed a motion to alter or amend the judgment, asserting that the injunction which had been entered had not complied with the requirements of the Prison Litigation Reform Act of 1996, 18 U.S.C. § 3626(a)(1). Therefore, on April 15, 1998 Judge Bloch entered an order which vacated the order of March 9, 1998 and remanded the case for further proceedings in accordance with the Prison Litigation Reform Act governing the grant of prospective injunctive relief. Following remand, the parties executed a consent to trial before me. In light of the requirements of the Prison Litigation Reform Act, as well as remedial actions already taken by Defendants, Plaintiffs have elected not to pursue their request for injunctive relief. This opinion therefore shall address Plaintiffs' request for declaratory relief.

Plaintiffs, prisoners confined in the capital case unit (death penalty unit) at the State Correctional Institution at Greene, brought this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, challenging various conditions of confinement in the death penalty unit.

Plaintiffs' instant Motion for Summary Judgment relates to their claim that the absence of a confidential meeting area for attorney visits on SCI–Greene's death row offends the Fourteenth Amendment right of privacy and the First Amendment right of free speech.[1] Defendants filed a Reply and a Cross–Motion for Summary Judgment seeking judgment as to Plaintiffs' claim that the lack of confidential meeting rooms to confer with attorneys deprived them of their rights under the Constitution.

Plaintiffs assert that the practice of requiring them to meet and confer with attorneys in settings that enable guards and other persons to overhear their confidential discussions entrenches upon their right to privacy and violates their rights to free speech under the First Amendment of the Constitution. Defendants do not dispute that the visiting booths are not sound proof. It is their opinion that Plaintiffs do not have a right under the Constitution to confidential communications with counsel. In their Statement of Material Facts Not in Dispute they stated:

It is not disputed by defendants that the L–5 visiting booths at SCI–Greene are not sound proof. Audible sound emerges during the course of conversations within the booth, which can be heard by persons within the visiting room behind the attorney's booth or in the corridor behind the inmate booth. It is not disputed that it is possible for a person in the visiting room to discern what is being said by an attorney in the last booth—in the row which is ordinarily used for such visits because of its out of the way placement. (Deposition of Gallentine at 31–32)—despite the person being required to stay behind a rope restricting access to the immediate outside corridor while a visit is taking place. It is unclear if the inmate[']s side of the conversation may also be overheard in such circumstances. It is submitted that, while he remains in the visiting room guard booth, a correction[s] officer cannot hear anything from the visiting booths. This corrections officer, however, periodically leaves his station in the guard booth to patrol the visiting room. Deposition of Price at 137. Visitors are sometimes waiting in the visiting room while other visits, including attorney visits occur. Deposition of Price at 90—92, 94, 137.

(Doc. No. 100 ¶ 24.) The Parties' Stipulation of Facts provides:

The visiting booths in which legal visits occur are not soundproof. As a result, audible sounds routinely emerge from the

---

1. The parties agree that Plaintiffs' First Amendment claim is properly before the Court.

booths during the course of conversations between inmates and their attorneys.

Although legal visits occur in three booths that are located behind a roped off area (which prevents third persons from walking immediately up to the booths), visitors seated or walking in the common area of the L–5 area can, nevertheless, hear and discern what is being said by an attorney to his client when the attorney speaks in a normal conversational tone.

It is also possible for the L–5 booth officer, when making his periodic tour of the attorney side of the common area, to hear and discern what the attorney is saying to his client in the course of a legal visit, when the attorney speaks in a conversational tone.

Prisoners and officers en route to visiting booths in the corridor behind the inmate side of the cubicle can hear and discern what the inmate is saying to his attorney during a legal visit, when the inmate speaks in a normal conversational tone.

If an inmate's voice is raised above a normal conversational tone, it is possible for his side of the conversation to be discerned by persons in the common area behind the attorney.

If an attorney speaks above a normal conversational tone, his side of the conversation can be discerned by persons in the corridor behind the inmate.

The fact that conversations with attorneys can be overheard by third persons has resulted in death row inmates not feeling free to discuss sensitive matters with their counsel for fear that other persons will overhear the discussion. As a result, there have been occasions where death row prisoners either have not discussed issues with counsel or have not gone into detail about issues for fear that the discussions would be overheard by other persons.

It has neither been alleged nor shown that a visitor or corrections officer has actively eavesdropped on a legal visit between a death row inmate and his attorney. Nor has it been alleged or shown that information related during a legal visit has ever been used to a death row inmate's detriment.

(App. to Pls.' Br. Support Mot. Summ. J. ¶¶ 18–25 (Doc. No. 121 at 4–6).)

Plaintiffs do not ground this claim on their right to access to court under the Fourteenth Amendment of the United States Constitution because they cannot show injury as now required by *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Defendants do not claim any security or institutional need to be able to overhear inmates' conversations with their attorneys. In fact, during oral argument of both Defendants' original Motion for Summary Judgment and the instant motion, Mr. Mericli advised that when the visiting area was originally designed it was the intention that conversations not be overheard. However, after it was put into use it was discovered that conversations could be overheard.

While Defendants admit that comments by an attorney can be heard by others in the visiting room they do not admit that statements made by inmates in a normal conversational tone can be heard. They admit that audible sounds by an inmate can be heard and that an inmate's side of a conversation can be heard if his voice is raised above a normal conversational tone. Plaintiffs have submitted a Declaration by Rachel H. Wolkenstein, an attorney admitted to practice in the State of New York who is one of the attorneys for Mumia Abu–Jamal, an inmate at Greene, representing him on his collateral appeals of his conviction for first degree murder and death sentence. On several occasions when another death row inmate had a visitor she was able to hear the conversation between both the inmate and his visitor although the doors were closed in both the booth she was in and the booth of the other inmate.

■ Neither of the grounds asserted by Plaintiffs as the bases for their right to confidential communications with counsel have been extensively analyzed by the courts. As to their privacy claim, this may be because prisoners who are awaiting trial or who are appealing their conviction have a right to counsel under the Sixth Amendment of the Constitution. *Douglas v. People of State of*

*California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). However, they do not have a constitutional right to counsel under the Sixth Amendment after their first appeal of right. *Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). But until the decision of *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2181–82, 135 L.Ed.2d 606 (1996), held that to show a denial of access to court under the Fourteenth Amendment of the United State Constitution a prisoner must show actual injury to a specific legal claim which sought to vindicate "basic constitutional rights," prisoners had a recognized right to privacy in communications with attorneys through their right of access to court. As to Plaintiffs' First Amendment claim, the focus in prior cases has been on the right to privacy in written communications with counsel.

*Right to Privacy under the Fourteenth Amendment*

In *Bieregu v. Reno,* 59 F.3d 1445, 1456 (3d Cir.1995),[2] in holding that a pattern and practice of opening a prisoner's properly marked incoming court mail outside his presence impinged on his constitutional rights to free speech and court access the court stated:

> Of all communications, attorney mail is the most sacrosanct. Thus, although the Sixth Amendment is not recognized as the repository for such a shield in civil matters, *see Finley, supra,* the right of court access guarantees the privacy of attorney-client communications.

With the limitations on access to court claims imposed by *Lewis,* prisoners who are not awaiting trial or disposition of their first appeal of right are now reduced to establishing a right to confidential communications with counsel through establishing a right to privacy protected by the Constitution. There is authority for such a right but it has not yet been clearly defined.

In *Bieregu* the court declined to address the right of privacy because the plaintiff had not raised it. However, the court stated:

The Supreme Court has recognized that the right to privacy survives incarceration. *Turner,* 482 U.S. at 95–99, 107 S.Ct. at 2265–67. Although authorized by § 540.18, routine reading of purely personal letters from friends and family, those daily expressions of affection and love, may implicate an inmate's right to privacy. Certainly personal information in the hands of prison officials may result in ridicule, harassment, and retaliation.... Similarly, opening legal mail outside the presence of an inmate, giving rise to the reasonable inference that such mail is read, may also implicate the right to privacy.

*Bieregu,* 59 F.3d at 1456 n. 5 (citations omitted).

In *Johnson–El v. Schoemehl,* 878 F.2d 1043 (8th Cir.1989), the court affirmed the denial of the defendants' Motion for Summary Judgment based on the defense of qualified immunity as to the plaintiffs' claim that they were required to meet with their attorneys in public areas of the jail where their conversations could be overheard by guards and other prisoners. The plaintiffs were pretrial detainees for whom the Sixth Amendment right to counsel was available but the court also referred to the right to privacy. The court stated: " '[s]uch conditions impede the detainees' ability to prepare for trial, jeopardize the confidentiality of their attorney-client communications and invade their right to privacy.' " *Id.* at 1053 (quoting *Moore v. Janing,* 427 F.Supp. 567, 576 (D.Neb.1976)).

In *Cantor v. Supreme Court of Pennsylvania,* 353 F.Supp. 1307 (E.D.Pa.), *aff'd,* 487 F.2d 1394 (3d Cir.1973), the court granted a motion by the defendants to dismiss a complaint filed by attorneys purporting to represent a class consisting of all attorneys in Pennsylvania challenging disciplinary rules adopted by the Supreme Court of Pennsylvania as in violation of the United States Constitution. In discussing the plaintiffs' argument that the rules infringed on the attorney-client relationship the court stated:

---

**2.** Although *Bieregu* was effectively overruled by *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), see *Oliver v. Fauver,* 118 F.3d 175 (3d Cir.1997), that would appear to apply only to its holding as to the plaintiff's access to court claim.

Further, the Rules do not infringe in any way on the inviolability of the attorney-client relationship; rather, they merely force an attorney to comply with the reasonable requirements of the Pennsylvania Supreme Court in order to continue in the active practice of law. Accordingly, even though the constitutional right to privacy blankets the attorney-client relationship, the summary suspension provisions do not unreasonably impinge on that right thereby depriving a client of his choice of counsel.

*Id.* at 1319.

Defendants cite *Lopez v. Robinson*, 914 F.2d 486 (4th Cir.1990), in support of their claim that Plaintiffs do not have a constitutional right to privacy in their communications with counsel. However, in that case the court merely held that the individual defendants were entitled to qualified immunity as to the plaintiffs' claim that the absence of soundproofing materials in the attorney-client visiting room plus the presence of a uniformed officer outside the door rendered the arrangement insufficient to protect their right to privacy, free access to counsel, and confidentiality of attorney-client communications. The prison regulations provided that "all conversations between the inmate and attorney may be visually observed by supervising officers, but not overheard, listened to, or recorded in any manner." The plaintiffs based their damage claims on two affidavits by inmates, one stating the observing officer once sat so close that he could hear the inmate's conversation with his lawyer and another in which a paralegal offered similar affidavit testimony. The court stated:

> Assuming that the inmates have alleged a violation of a clearly established constitutional right of access to the courts, no record evidence establishes that any of the named defendants were personally involved with these incidents of alleged constitutional deprivations. Because liability under § 1983 cannot be premised on *respondeat superior*, the prison officials are entitled to summary judgment on this claim.

*Id.* at 494 (citations omitted). This case does not support Defendants' argument that Plaintiffs do not have a right under the Constitution to private communications with counsel.

In *Nixon v. Administrator of General Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court appears to have recognized a constitutional right to privacy. The Court upheld an act passed by Congress which directed the Administrator of General Services to take custody of the presidential papers and tape recordings of former President Richard M. Nixon and promulgate regulations that provided for the orderly processing and screening by Executive Branch archivists of such materials for the purpose of returning to Nixon those that were personal and private in nature and determine the terms and conditions upon which public access may eventually be had to those materials that were retained. The Court stated:

> In sum, appellant has a legitimate expectation of privacy in his personal communications. But the constitutionality of the Act must be viewed in the context of the limited intrusion of the screening process, of appellant's status as a public figure, of his lack of any expectation of privacy in the overwhelming majority of the materials, of the important public interest in preservation of the materials, and of the virtual impossibility of segregating the small quantity of private materials without comprehensive screening. When this is combined with the Act's sensitivity to appellant's legitimate privacy interests, the unblemished record of the archivists for discretion, and the likelihood that the regulations to be promulgated by the Administrator will further moot appellant's fears that his materials will be reviewed by "a host of persons," we are compelled to agree with the District Court that appellant's privacy claim is without merit.

*Id.* at 465 (citations omitted).

In *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), the Court recognized that inmates in jails, prisons or mental institutions retain a fundamental right of privacy.

In *Woods v. White*, 689 F.Supp. 874 (W.D.Wis.1988), *aff'd*, 899 F.2d 17 (7th Cir.

1990), the court found that the plaintiff, a prisoner, had a constitutional right to privacy in his medical records and denied the defendant's motion for judgment on the pleadings as to the plaintiff's claim that the defendants, medical service personnel, had discussed with non-medical staff and other inmates the fact that he had tested positive for the AIDS virus. The court noted that in *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Court had identified two different kinds of privacy interests: The " 'interest in independence in making certain kinds of important decisions,' and the interest 'in avoiding disclosure of personal matters.' " *Id.* at 875 (citations omitted). The court refused to find that the defendants were entitled to a defense of qualified immunity, stating: "I think it would have been clear to a competent public official in 1986 that individuals had a constitutional right to privacy in information relating to AIDS." *Id.* at 877.

There appears to be a right to privacy protected by the United States Constitution, although the courts have not clearly identified the precise source of that right or the extent of it. In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), a case in which the Court held that a New York act which required that the names and addresses of all persons who had obtained, pursuant to a doctor's prescription, certain drugs for which there is both a lawful and an unlawful market, did not violate the Constitution, the Court identified several possible sources of the right to privacy. It seemed to suggest that the primary source is the Fourteenth Amendment. The Court stated:

> Language in prior opinions of the Court or its individual Justices provides support for the view that some personal rights "implicit in the concept of ordered liberty" are so "fundamental" that an undefined penumbra may provide them with an independent source of constitutional protection. In *Roe v. Wade*, however, after carefully reviewing those cases, the Court expressed the opinion that the "right of privacy" is founded in the Fourteenth Amendment's concept of personal liberty,
>
> This right of privacy, whether it be founded in the Fourteenth Amendment's

concept of personal liberty and restrictions upon state action, *as we feel it is,* or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.

*Whalen,* 429 U.S. at 598–599 n. 23, 97 S.Ct. 869 (quoting *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)) (emphasis in original) (citations omitted). The Court also noted that Professor Kurland had identified in an article in the University of Chicago Magazine 7, 8 (autumn 1976), three facets of the right of privacy. The first is the right of the individual to be free in his private affairs from governmental surveillance and intrusion. The Court recognized that this right is directly protected by the Fourth Amendment. The second is the right of an individual not to have his private affairs made public by the government and the third is the right of an individual to be free in action, thought, experience, and belief from governmental compulsion. These last two facets were the ones applicable to that case, which the Court indicated were protected by the Fourteenth Amendment's concept of personal liberty. *Id.* at 599 n. 24, 97 S.Ct. 869. The Court also noted that in *Griswold v. State of Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), Justice Douglas, writing for the Court, stated, "[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion." *Id.* at 599 n. 25, 97 S.Ct. 869.

█ Now that the constitutional right of access to court is no longer available to prisoners to preserve the confidentiality of their communications with their counsel unless they can meet the difficult test of injury set forth in *Lewis,* or unless the Sixth Amendment is available, they will reasonably look to the right of privacy to assure their right to confidential communications with counsel. This seems to be an appropriate application of the right of privacy. Therefore, as to this claim Plaintiffs' Motion for Summary Judgment will be granted and Defendants' Motion for Summary Judgment will be denied. Plaintiffs' Motion for declaratory relief will also be granted.

*First Amendment Right to Free Speech*

In *Bieregu v. Reno,* 59 F.3d 1445, 1450 (3d Cir.1995)[3] the court recognized that the First Amendment right to free speech survives incarceration and determined that the use of the mails is included in the right to free speech. "As Justice Holmes recognized years ago, ... 'the use of the mails is almost as much a part of free speech as the right to use our tongues.'" *Id.* at 1451. The court noted that the Fifth Circuit had concluded that "'[t]he precise contours of a prisoner's right to free speech are ... obscure.'" *Id.* at 1452 (citing *Brewer v. Wilkinson,* 3 F.3d 816, 821 (5th Cir.1993)). The court added:

> [W]e are satisfied that a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by the right to free speech. Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court.

*Id.*

 In *Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) the Court recognized that prisoners retain First Amendment rights subject to the needs of order and security within the prison. When a prison regulation limits prisoners' First Amendment rights, its validity depends on whether it is "'reasonably related to legitimate penological interests.'" *Id.* at 413, 109 S.Ct. 1874 (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). To determine reasonableness the court must consider the governmental objective underlying the regulations at issue; whether the regulation is rationally related to that objective; whether it is neutral as to content; whether there are alternative means of exercising the right that remain open to inmates; and the impact that accommodation of the asserted constitutional right will have on others in the prison. In this case Defendants do not assert any order, security, or other administrative need to provide private rooms for attorneys to meet with their clients in which they can be assured their conversa-

tions cannot be overheard by others. It would seem that this could end the inquiry. Defendants simply have not claimed any administrative or security need. However, considering all of the factors, it is noted that the policy is content neutral, and that an argument could be made that there are alternative means of exercising the right—prisoners can write confidential letters to their counsel. On the other hand, the only impact accommodation would have upon others in the prison, would be the expense of soundproofing the rooms. Under the standards discussed in *Thornburgh* Defendants have offered no basis for infringing on Plaintiffs' right to freedom of speech under the First Amendment.

Defendants argue that Plaintiffs have not shown that they have been "chilled" in the exercise of their freedom of speech, although they admit that Plaintiffs have shown that they do not feel free to discuss sensitive matters with their counsel for fear of being overheard by others, resulting in their failing fully to discuss issue of concern with their attorneys and failing to discuss some issues at all. Defendants cite *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) as authority for their argument that Plaintiffs have not shown legally cognizable harm. In that case the Court held that the plaintiffs had not established standing to challenge a data-gathering system established by the Army to enable it to assist local authorities to respond to insurrection and other domestic violence. A critical distinction between the facts in *Laird* and this case is that in that case all of the information gathered was public information. The principal sources of the information were the news media and publications in general circulation. The Court recognized that constitutional violations may arise from the deterrent, or "chilling," effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights. *Id.* at 11, 92 S.Ct. 2318. The Court noted in a footnote that the plaintiffs had cast considerable doubt on whether they themselves were in fact suffering from any chill. *Id.* at 13 n. 7, 92 S.Ct. 2318. At the oral argument before the District Court, counsel for the plaintiffs had

---

3. See footnote 2 *supra.*

admitted that his clients were "'not people, obviously, who are cowed and chilled.'" *Id.* The Court stated:

> Even assuming a justiciable controversy, if respondents themselves are not chilled, but seek only to represent those "millions" whom they believe are so chilled, respondents clearly lack that "personal stake in the outcome of the controversy" essential to standing.

*Id.* The Court further stated that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; ....." *Id.* at 13–14, 92 S.Ct. 2318.

*Laird* is not applicable here. In *Laird* the Army was merely collecting public information about the plaintiffs who claimed that the existence of the Army's data-gathering system produced a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights. Here Plaintiffs have shown that the ability of other persons to overhear their conversations with their attorneys prevents them from being able to discuss private matters with their attorneys and results in limiting their discussions with their attorneys. Plaintiffs have shown actual injury.

It is recognized that the First Amendment right to free speech has not clearly been applied to assure confidential oral communications between prisoners and their attorneys, but it seems that it should be at least as clear as the right to confidential written communications. Therefore, Plaintiffs' Motion for Summary Judgment shall be granted; Defendants' Motion for Summary Judgment shall be denied and the declaratory relief discussed above shall be granted.

### ORDER

AND NOW, this 16th day of October, 1998;

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is granted and that Defendants' Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that the declaratory judgment entered on March 9, 1998 is reinstated and shall relate back to March 9, 1998.

IT IS HEREBY DECLARED that Defendants have deprived Plaintiffs of their right to freedom of speech under the First Amendment of the United States Constitution and their right to privacy under the Fourteenth Amendment by failing to provide them with a place where they can have private conversations with counsel without being overheard by others.