REVISED, OCTOBER 5, 2000

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

―――――――――――――

No. 98-31335

―――――――――――――

DIANE MILLIGAN, Individually and on Behalf of her Minor Son, Eric
Milligan; WAYNE WALKER, Individually and on Behalf of his Minor
Son, Logan Walker; JOHN LAURENSON, Individually and on Behalf of
his Minor Son, Nathan Laurenson; RICARDO S. CRUZ, SR.,
Individually and on Behalf of his Minor Son, Chance Cruz; DENNIS
KAHOE, Individually and on Behalf of his Minor Son, Rocky Kahoe,

Plaintiffs-Appellees-Cross-Appellants,

v.

THE CITY OF SLIDELL, through the Slidell Police Department,

Defendant-Cross-Appellee,

JOHN EMERY, Sergeant, and LOUIS THOMPSON, Reserve Officer

Defendants-Appellants-Cross-Appellees

―――――――――――――――――――――――――――――――――――――

Appeals from the United States District Court for the
Eastern District of Louisiana

―――――――――――――――――――――――――――――――――――――

September 27, 2000

Before REYNALDO G. GARZA, JONES and EMILIO M. GARZA, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In this civil rights case, the district court held that
police officers nominally invaded the rights of high school students
by having them called out of class for questioning about a rumored

after-school fight.  We reverse.  Even assuming that the students had some kind of right to avoid detention at school for disciplinary questioning, the "seizure" effected here was reasonable because students' Fourth Amendment rights are evaluated according to the "special needs" of the public school environment.  *See* <u>Vernovia School District 47J v. Acton</u>, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

**FACTS AND PROCEDURAL HISTORY**

On January 26, 1997 a fight occurred involving several of the plaintiffs, who attended Salmen High, and Louis Thompson's two high school-aged sons, who attended Slidell High in Slidell, Louisiana.  Two days later, a Salmen High student named David Gelis contacted Thompson and informed him that a retaliatory fight, possibly involving weapons, was to occur at Slidell.  According to Gelis, he had heard some people were "going to jump" Thompson's sons.  Thompson contacted Emery the next morning about the possible fight, and, after discussing the issue with Salmen's football coach, the three men went to Salmen High to defuse the situation.

Thompson had compiled a list of students, with the help of his sons and perhaps also Mr. Gelis, who were alleged or known to have been involved in the previous altercation or were believed to be enemies of the Thompson boys.  At the high school, Emery and Thompson requested that Vice Principal Smith call certain students

from class for questioning. Vice Principal Smith did so. The officers first met with the coach and several football players, who confirmed that a fight involving baseball bats was going to occur later that day at Slidell High. The officers next met with the plaintiffs. The meeting lasted ten to fifteen minutes, as the officers questioned the students about the fight and warned them that their parents would be called if a fight should occur and an investigation connected them to it. Vice Principal Smith testified that the officers had no physical contact with the students and that the students appeared to want to tell their side of the story. Eric Milligan, the only plaintiff to testify, asserted that he felt physically intimidated and that he did not feel free to leave the meeting, as the assistant principal had called him into her office. The officers' intervention succeeded in warding off any show-down.

Through their parents, the plaintiffs filed suit against Thompson, Emery and the City of Slidell. After a bench trial, the district court dismissed the claim against the city but held that the two officers had violated the plaintiffs' Fourth Amendment rights and were not entitled to qualified immunity. Although the plaintiffs had not proven compensatory damages, the court awarded nominal damages. That finding deprived them of "prevailing party" status, and the court accordingly refused to award attorneys' fees. Both sides appealed.

**DISCUSSION**

Qualified immunity shields public officials, like the officers here, from damages actions unless their conduct was unreasonable in light of clearly established law. *See* Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 1123, 127 L.Ed.2d 344 (1994). In a qualified immunity case, a court often initially decides whether the facts establish a violation of a constitutional right at all. *See* Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999). Whether a constitutional right has been violated is a question of law that this court reviews *de novo*. *See* United States v. Hernandez-Zuniga, 2000 WL 767381 (5th Cir. 2000). If the facts establish a constitutional violation, courts then consider whether that right was clearly established. *See* Wilson, 526 U.S. at 609.

The district court held that officers Emery and Thompson violated the students' clearly established Fourth Amendment rights by detaining them in the Vice-Principal's office without particularized suspicion that any of them had engaged in or was about to engage in criminal misconduct. The district court, unsure how to characterize what happened, settled on the Terry case[1] as the closest Fourth Amendment analogy -- hence, he concluded, the officers conducted an "investigative detention," which under Terry

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

4

requires reasonable suspicion of past or incipient criminal activity. Even if this analysis were generally correct for investigative activities of the sort the officers performed -- a proposition we do not comment on -- it fails in this case because it neglects the all-important school context.

Some elementary principles: The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." *See* <u>Terry</u>, 392 U.S. at 8 (citing U.S. Const., amend. IV). The central inquiry under the Fourth Amendment is whether a search or seizure is reasonable under all the circumstances of a particular governmental invasion of a person's personal security. *See* <u>Terry</u>, 392 U.S. at 19. To assess the reasonableness of a search or seizure, courts balance the governmental interest against the invasion which the search or seizure entails. *See id*. at 20 - 21.

Balancing renders essential a consideration of the context in which a Fourth Amendment right is asserted. Because this case involves the rights of students in a public school, a full bore <u>Terry</u> analysis is inappropriate.[2] Rather, our inquiry is directed by <u>Vernonia School District 47J v. Acton</u>, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), where the Supreme Court considered the

---

[2] <u>Terry</u> pertains to investigation of suspected criminal activity. The officers' purpose in this case was to deter a fight, secure discipline in the schools, and thus to avoid criminal sanctions.

5

role of the Fourth Amendment in the school context. The Court indicated that although the Fourth Amendment applies in schools, the nature of those rights is what is appropriate for children in school. *See id.* at 655 – 56. The reasonableness inquiry must take into account the schools' "custodial and tutelary responsibility for children." *See id.* at 656. Furthermore, students in the school environment have a "lesser expectation of privacy than members of the population generally." Vernonia, 515 U.S. at 657 (quoting New Jersey v. T.L.O., 469 U.S. 325, 348, 105 S.Ct. 733, 746, 83 L.Ed.2d 720 (1985)).

Turning to the students' interests, it is not at all clear that they have some privacy right not to be summoned to and detained in a school official's office for questioning on matters of school discipline. The Fourth Amendment does not protect all subjective expectations of privacy, but only those recognized by society as legitimate. The "right" advocated by these students -- to remain in class unhindered during the school day -- if a right at all -- is surely of less intrinsic importance than the rights not to have one's property searched or to avoid random drug testing for athletics. Yet the Supreme Court held that such invasions may occur in schools. *See* TLO, 769 U.S. at 347; Veronia, 515 U.S. at 664-65. Indeed, any such right of unhindered attendance is logically inconsistent with the mandate of compulsory attendance and a

6

structured curriculum, and it hardly squares with the schools' obligation to "inculcate the habits and manners of civility. . . ." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681, 106 S.Ct. 3159, 3163 (1986). Out of caution, however, we assume that some such right exists at a low level.

Consideration is next given to the nature and immediacy of the governmental concern as well as the efficacy of the means used to address it. In this case, the school sought to protect its students, to foster self-discipline and to deter possibly violent misconduct. These are compelling governmental interests. And the immediacy of the concerns is obvious, since the retaliatory fight was due to happen that day.

Furthermore, the means the officers chose to address the potential problem was effective. They enlisted the aid of Salmen's football coach after learning that football players might be involved. The coach, who was in a position to exert direct authority and maintain discipline over his players, found out which players to question. The officers proceeded through school channels by using the Vice-Principal's power to summon the plaintiffs (and others) for interrogation and admonishment. Nothing was done that school officials could not have done themselves. Conversely, no more was done than necessary to discourage the fight.

The students assert that the officers' visit may not have been the least intrusive way to protect the school's interests.

7

However, the Supreme Court has refused to impose any least restrictive means test upon searches under the Fourth Amendment.[3] *See* <u>Vernonia</u>, 515 U.S. at 663. The district court suggested that the officers should have just gone over to Slidell High after school and waited to see if anything happened. This course of action hardly seems as efficacious as the one chosen; it might well have simply prompted a relocation or postponement of the fight. Nor would talking to the parents have availed, for the fight was scheduled to occur too soon for the parents to intervene.

From what has been said, it should be clear that the privacy right asserted does not outweigh the school's interests. Students in the school environment have a lesser expectation of privacy than the general population. Teachers and administrators control their movements from the moment they arrive at school; for example, students cannot simply walk out of a classroom. Nor can they walk out of a principal's or vice-principal's office in the middle of any official conference.[4] Students at school thus have a

---

[3] The district court stated that part of the reason it found a Fourth Amendment violation was that there were "lot[s] of things they [Emery and Thompson] could have done [to address the problem] without detaining these students in the office the way they did." To the extent that the district court implied that only the least intrusive method is lawful, it was in error. The reasonableness of a search or seizure is evaluated on its own merits, not by engaging in a series of 'what ifs.'

[4] In fact, Mr. Milligan, when asked why he had not felt free to leave the room, responded: "What you mean? The assistant principal calls you in the office, you can't just walk out of a meeting." His statement indicates that his not feeling free to leave owed more to the custodial role of the school than it did to the coercive authority of the officers.

8

significantly lesser expectation of privacy in regard to the temporary "seizure" of their persons than does the general population. That lesser expectation of privacy was in full force here, where the Vice-Principal had called the students into her office and attended the entire meeting.

Considering the weakness of the claimed privacy right and the significance of the governmental concern, the officers' actions were reasonable and therefore constitutional. Because the district court erred in finding a constitutional violation, we reverse the district court and render judgment for the defendants.

**REVERSED and RENDERED.**