Jennyfer BRAVO, By and Through her Guardian Ad Litem, Martha RAMIREZ, Martha Ramirez, Plaintiffs,

v.

Norman HSU, Sandy Johnson, Joseph Chang, Felicia Minardi, Anita Perez, Barbara Aguilar, Steve Behar, Barbara Nakaoka, Does 1 through 10, Defendants.

No. SACV 03–535 CJC MAN.

United States District Court,
C.D. California,
Southern Division.

Nov. 18, 2005.

Luis A. Carrillo, Luis Carrillo Law Offices, Montebello, CA, for Plaintiffs.

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

CARNEY, District Judge.

## I. INTRODUCTION

This action involves the search and detention of Jennyfer Bravo, an eighth grade student at Sierra Vista Middle School ("Sierra Vista"). Jennyfer and her mother, Martha Ramirez, contend that Jennyfer's

Fourth Amendment rights were violated when the Sierra Vista officials searched Jennyfer's backpack, pockets and shoes for illegal drugs, and then detained her in the principal's office for a few hours until her mother arrived at the school.[1] Although school officials ultimately found no illegal drugs in Jennyfer's possession, they concluded after questioning her and other students that Jennyfer had possessed illegal drugs earlier in the day. The school officials now seek summary judgment on Jennyfer's claims, contending that they are entitled to qualified immunity because the search and detention of Jennyfer was reasonable under the circumstances. The Court agrees with the school officials and, accordingly, enters summary judgment in their favor.

## II. BACKGROUND

On November 1, 2001, Sierra Vista Restroom Attendant Bonnie Minjares told Assistant Principal Steven Behar that she had cleared the 8th grade girls' restroom at Sierra Vista because of rowdy behavior and overcrowding. (Behar Decl., ¶ 4.) Approximately ten minutes later, Assistant Principal Behar was approached by a female student, who said the commotion in the 8th grade girls' restroom was due to the fact that Jennyfer possessed and possibly was using drugs that day. (*Id.*, ¶ 5.) Assistant Principal Behar and Restroom Attendant Minjares then took Jennyfer to the Principal's office and told the Principal, Barbara Aguilar, about the restroom commotion and the student's report. (Aguilar Decl., ¶ 3.)

Based on the statements of Assistant Principal Behar and Restroom Attendant Minjares, Principal Aguilar decided Jennyfer should be searched for Jennyfer's protection and that of the other students. (Aguilar Decl., ¶ 4.) Principal Aguilar and Assistant Principal Behar asked Jennyfer to stand up and let them see her backpack. (Deposition of Jennyfer Bravo, "Bravo Depo.," 78:2–11; attached as Exh. L to Bakshandeh Decl.) Jennyfer complied. (*Id.*, 78:9–11.) Assistant Principal Behar then searched Jennyfer's pockets, shoes, and backpack, taking less than five minutes to do so. (*Id.*, 78:16–23.) Assistant Principal Behar did not do anything else during the search, and did not pat Jennyfer down. (*Id.*) Upon finding no drugs on Jennyfer, Principal Aguilar released her and allowed her to return to class. (Aguilar Decl., ¶ 5.)

Throughout the day, numerous other students told school officials that they had seen Jennyfer possessing and possibly using drugs in the girls' restroom. First, a science teacher reported that a student named Rachel Rodriguez had reported seeing Jennyfer use drugs in the restroom during the first lunch period and that the student was being threatened by other students to keep quiet. (Behar Decl., ¶ 7.) When summoned to the front office, Rachel reported that she had seen "a girl," whom she identified in the yearbook as Jennyfer, using drugs in the restroom and that two other students—Yessica Lopez and Daniel Mora—knew about the incident. (Aguilar Decl., ¶ 6; Exh. A thereto.) Rachel gave a written statement that she had seen Yessica and Daniel talking outside the restroom, that Daniel had asked Yessica what she had, and that Yessica had taken something that looked like a needle out of her pocket. (Aguilar Decl., ¶ 6; Exh. A thereto.)

---

**1.** Plaintiffs also argued that Jennyfer's rights were violated under the Fourteenth Amendment. The Ninth Circuit, however, has held that students' constitutional challenges to searches and seizures by school officials are properly analyzed under the Fourth Amendment, and not the Fourteenth Amendment's due process clause. *Doe v. State of Hawaii Dept. of Education*, 334 F.3d 906, 908–09 (9th Cir.2003). Thus, the Court considers Plaintiffs' claims under the Fourth Amendment only.

Principal Aguilar summoned Yessica and Daniel to the office to question them. (Aguilar Decl., ¶ 7.) Daniel told Principal Aguilar and Assistant Principal Behar that Jennyfer had asked a student named Willy Coria to bring drugs to school, that Daniel had heard Jennyfer was using drugs due to family problems, that Jennyfer had been in the restroom with Yessica while he was standing near the restroom, and that he had seen Jennyfer run out of the restroom crying. (Behar Decl., ¶ 9, Exh. B thereto.) Daniel also said that Yessica told him, while they were outside the restroom, that she (Yessica) had taken a plastic "baggie" containing a white powdery substance away from Jennyfer. (Behar Decl., ¶ 9.) Daniel said he told Yessica to flush the "baggie" down the toilet, and that she had done so. (Behar Decl., ¶ 9, Exh. B thereto.)

Yessica corroborated Daniel's story. She told Principal Aguilar and Assistant Principal Behar that Jennyfer had shown her a plastic "baggie" containing a white substance, which Yessica said was drugs, in the girls' restroom. (Aguilar Decl., ¶ 8.) In a statement Yessica wrote that day, she said she had seen Jennyfer pull the drugs from her pocket. (Behar Decl., ¶ 10; Exh. C thereto.) Yessica said she had taken the drugs away from Jennyfer, because Jennyfer was her friend and she "[didn't] want her to be doing drugs." (Exh. C. to Behar

Decl.) Yessica said she had told Daniel that she had taken the drugs from Jennyfer, and that she then had reentered the bathroom with a student named Adrianna Flores and flushed the "baggie" down the toilet. (Aguilar Decl., ¶ 8; Exh. C thereto.)

Adriana Flores and Willie Coria further corroborated both Daniel's and Yessica's statements. Upon being summoned to Principal Aguilar's office, Adriana said that she had seen Jennyfer with a "baggie" containing a white substance in the girls' restroom, and heard Daniel tell Yessica to flush something down the toilet to prevent it from being discovered. (Aguilar Decl., ¶ 10.) Willie stated that he had found a "baggie" containing what appeared to be drugs, and had given it to Jennyfer. (Aguilar Decl., ¶ 9.)

Based on this information, Principal Aguilar again summoned Jennyfer to her office, where Jennyfer gave a statement to the office manager, Mrs. Laura Silva. (Aguilar Dec., ¶ 12; Exh. F thereto.) Jennyfer admitted in her statement that she had received a "baggie" from Willy, that she had told Yessica about the bag and showed it to her, and that Yessica had taken it away from Jennyfer. (Exh. F. to Aguilar Decl.) Jennyfer was detained in Principal Aguilar's office for approximately three hours and was not allowed to return to class.[2] Jennyfer's mother, Martha Ramirez, was called to the school and told

2. Although Plaintiffs did not present evidence as to the length of Jennyfer's detention in their papers opposing summary judgment, Plaintiffs asserted in their Third Amended Complaint that Jennyfer was detained in Principal Aguilar's office for three hours, and Defendants do not controvert that allegation. (Third Amended Complaint, ¶ 12; Defendants' Answer to Third Amended Complaint, ¶ 12.) Plaintiffs' Third Amended Complaint is ambiguous as to whether the detention occurred in two segments, or whether it was a continuous three-hour period. In one paragraph, the Third Amended Complaint states

that the detention occurred in two segments: the first hour during the initial search and questioning of Jennyfer, before she was allowed to return to class, and the other two hours after Jennyfer was summoned to Principal Aguilar's office the second time. (Third Amended Complaint, ¶ 12.) In the next paragraph, however, the Third Amended Complaint alleges "approximately two to three hours after the detention of Jennyfer ... [Jennyfer's mother] arrived at the school." (Third Amended Complaint, ¶ 13.) As Defendants do not contest Plaintiffs' account of the number

what had happened, and arrived there to meet with her daughter and Principal Aguilar. (Aguilar Decl., ¶¶ 13–14.) When Ms. Ramirez arrived at the school, she saw that Jennyfer was severely upset and crying, and that her eyes were swollen. (Ramirez Depo., 20: 6–15.) Ms. Ramirez was worried for her. (*Id.* at 20:14–15.) After the meeting, Ms. Ramirez took Jennyfer to the hospital, because Jennyfer's "head ached a lot and she was crying a lot." (*Id.* at 49:6–20.)

During the meeting with Sierra Vista officials and Ms. Ramirez, Jennyfer admitted to Principal Aguilar that she had "a problem" and admitted that she had used drugs in the past. (Aguilar Decl., ¶ 14.) Principal Aguilar explained to Jennyfer and Ms. Ramirez that the incident was serious, described its possible ramifications, and outlined the school district's procedures for conducting an expulsion hearing. (Aguilar Decl., ¶ 16.) Principal Aguilar then placed Jennyfer on suspension. (*Id.*) Principal Aguilar subsequently recommended to the Hacienda La Puente Unified School District ("HLPUSD")[3] that Jennyfer be expelled. After a hearing, which Jennyfer, Ms. Ramirez, and Jenny-

fer's step-father attended, the hearing panel decided not to expel Jennyfer, but instead transferred her to another school. (Aguilar Decl., ¶ 21.) Jennyfer states that, after she was transferred from Sierra Vista, she became depressed and lost interest in eating and other activities. (Bravo Depo., 113:11–18.).

Jennyfer, by and through Ms. Ramirez, her guardian ad litem, and Ms. Ramirez in her individual capacity, sued Principal Aguilar and Assistant Principal Behar, HLPUSD School Board Members Norman Hsu, Sandy Johnson, Joseph Chang, Felicia Minardi, and Anita Perez, and HLPUSD Superintendent Barbara Nakaoka, for violation of Jennyfer's rights under the Fourth and Fourteenth Amendments, and for intentional infliction of emotional distress and negligence under state law. Ms. Ramirez also asserted a claim in her individual capacity against all defendants, for negligent and intentional infliction of emotional distress, on the theory that Defendants intentionally and negligently injured Ms. Ramirez by causing her to observe her daughter distraught in Principal Aguilar's office. Defendants moved for summary judgment on all claims.[4]

of hours for which Jennyfer was detained, and taking the facts in the light most favorable to Plaintiffs, the Court will assume for purposes of this motion that Jennyfer was detained in the office for a continuous three-hour period, the second time she was called to the office.

3. Sierra Vista Middle School is one of the schools within HLPUSD.

4. Although Plaintiffs' Third Amended Complaint asserted constitutional challenges to the expulsion hearing, Plaintiffs' papers opposing summary judgment make no arguments based on any alleged denial of Plaintiffs' right to a hearing. As Plaintiffs do not argue the issue, or contend that they have not had a full and fair opportunity to conduct discovery as to the issue, they have waived any arguments based on any alleged inadequacy of the notice of hearing or the hearing

itself. *See Bankamerica Pension Plan v. McMath,* 206 F.3d 821, 826 (9th Cir.2000) ("A party abandons an issue when it has had a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case."); *U.S.A. Petroleum Co. v. Atlantic Richfield Company,* 13 F.3d 1276, 1279–82 (9th Cir.1994) (plaintiff waived the right to present evidence as to an argument it chose not to argue in its opposition to defendant's summary judgment motion). In any event, the undisputed facts establish that Plaintiffs were given due process. Ms. Ramirez conceded in her deposition that, before the hearing, she received a letter from a HLPUSD official informing her of (1) the hearing date, time, and location, (2) her right to attend the hearing, (3) her right to be represented by an attorney or non-attorney advisor, present oral and documentary evidence on Jennyfer's behalf, and confront and question witnesses at the hear-

## III. ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party in a summary judgment motion bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes this initial showing, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citation omitted). Where, as here, the non-moving party bears the burden of proof at trial on an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element in order to avoid summary judgment. *Id.* at 322, 106 S.Ct. 2548. To defeat a summary judgment motion, the opponent may not rely on the pleadings, but must affirmatively come forth with sufficient evidence to substantiate its claims or defenses. *Id.* at 324, 106 S.Ct. 2548.

■ Defendants assert qualified immunity as a defense. Public officials such

as Defendants are entitled to qualified immunity unless their conduct violates "'clearly established constitutional rights of which a reasonable person would have known.'" *P.B. v. Koch*, 96 F.3d 1298, 1301 (9th Cir.1996) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In determining whether school officials are entitled to summary judgment on the basis of qualified immunity, the Court must first determine whether, taking the facts in the light most favorable to the plaintiff, the defendants' alleged conduct constituted a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If no such violation occurred, school officials are entitled to qualified immunity. *Id.* If sufficient evidence is presented at summary judgment to make out a constitutional violation, the school officials still are entitled to qualified immunity if the constitutional right they violated was not clearly established. *Doe v. State of Hawaii Dept. of Education*, 334 F.3d 906, 908 (9th Cir.2003). A right is clearly established if, considering the factual context of the case, it would have been clear to a reasonable school official that what he was doing was a violation of the right. *Katz*, 533 U.S. at 202, 121 S.Ct. 2151. The Court does not need to undertake the "clearly established" inquiry in this case, as it finds that school officials did not violate any constitutional right when they searched and detained Jennyfer.

■ If school officials are to educate their students, they must maintain a safe and positive learning environment. Drug use severely compromises this goal. School officials, therefore, have a duty vig-

---

ing, and (4) the specific Education Code provisions Jennyfer was charged with violating. (Bakshandeh Decl., Exh. K thereto, 41:12–15; Nakaoka Decl., ¶ 4; Exh. I thereto.) Furthermore, at the hearing, Plaintiffs were allowed

to present their defense. Thus, Plaintiffs were given notice and an opportunity to be heard. *Gonzales v. McEuen*, 435 F.Supp. 460, 466–67 (C.D.Cal.1977).

orously and fairly to enforce regulations prohibiting illegal drug possession and use on campus. To perform that duty, school officials have authority reasonably to search and detain a student that they suspect may be possessing drugs. *See New Jersey v. T.L.O.*, 469 U.S. 325, 341–42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (*quoting Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

The authority granted to school officials in this regard, however, is not limitless. The Fourth Amendment's requirement that searches and seizures be "reasonable" applies to searches of students by school officials. *T.L.O.*, 469 U.S. at 333–36, 105 S.Ct. 733. In *Vernonia School District 47J v. Acton*, the Supreme Court stated that, in the school context, the reasonableness inquiry must take into account schools' "custodial and tutelary responsibility for children," and that students at school have a " 'lesser expectation of privacy than members of the public generally.' " *Acton*, 515 U.S. 646, 656–57, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (*quoting T.L.O.*, 469 U.S. at 348, 105 S.Ct. 733 (Powell, J., concurring)). Recognizing that "the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly reasonable if undertaken by an adult," the Supreme Court concluded that the Fourth Amendment does not require a warrant or probable cause for searches of students by school officials. *T.L.O.*, 469 U.S. at 339–41, 105 S.Ct. 733 (*citing Terry*, 392 U.S. at 20, 88 S.Ct. 1868). Rather, such a search comports with the Fourth Amendment where it is (1) justified in its inception, and (2) reasonably related in scope to the circumstances which justified the search in the first place. *T.L.O.*, 469 U.S. at 341–42, 105 S.Ct. 733. The Court analyzes the search and detention of Jennyfer separately under this legal standard.

## A. The Search Was Lawful

The search of Jennyfer's backpack, pockets and shoes was justified in its inception. "Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341–42, 105 S.Ct. 733. Such grounds existed in this case. By the time Principal Aguilar and Assistant Principal Behar decided to search Jennyfer, they had received reports from both Restroom Attendant Minjares and an eighth grade student of a commotion in the eighth grade girls' restroom, and had been told by the student that the commotion was due to Jennyfer's possession and use of illegal drugs. Based on that information, it was reasonable for them to suspect that Jennyfer might have illegal drugs and that an immediate and limited search of Jennyfer was appropriate. Had the school officials waited to conduct the search, Jennyfer could have easily disposed of the drugs by flushing them down a toilet or throwing them in a trash can.

The search was also reasonable in scope. That standard is met where "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993) (*quoting T.L.O.*, 469 U.S. at 341–42, 105 S.Ct. 733.) Here, Assistant Principal Behar's search was precisely focused on his objective of determining whether Jennyfer had illegal drugs in her possession. He looked only in her backpack, pockets, and shoes: the places a student would be most likely to store

drugs. The search was not excessively intrusive in light of Jennyfer's age and sex: Jennyfer was not asked to disrobe or physically touched, and the search was conducted in the privacy of Principal Aguilar's office, away from the view of other students. Indeed, the search was only slightly more intrusive than what a student of Jennyfer's age might expect at an airport or athletic event, where authorities routinely search attendees' bags and/or shoes without any reason to suspect the attendees have violated the law, and where the search is likely to be seen by much greater numbers of people. The entire search took less than five minutes to complete. In short, the search was well within the bounds of the Fourth Amendment.

## B. The Detention Was Lawful

 Nor did Sierra Vista officials commit an unconstitutional seizure by detaining Jennyfer in Principal Aguilar's office for three hours after numerous students reported that she had possessed and used drugs that day. The constitutionality of seizures of students by school officials is determined in light of all the circumstances, and in light of the educational objectives the school officials are trying to achieve. *State of Hawaii*, 334 F.3d at 909; *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir.1995) (*citing Edwards v. Rees*, 883 F.2d 882 (10th Cir. 1989)). As with searches, seizures of students by school officials must be reasonably related to their purpose, and must not be "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *State of Hawaii*, 334 F.3d at 909 (*quoting T.L.O.*, 469 U.S. at 325, 105 S.Ct. 733.) That standard was met here.

Sierra Vista officials' detention of Jennyfer was reasonably related to three legitimate educational objectives: (1) protecting Jennyfer and other students from classroom disruptions that would likely result from the presence of drugs on campus, (2)

disciplining Jennyfer, and (3) preventing Jennyfer from using drugs or distributing them to other students. Principal Aguilar had reasonable grounds to summon Jennyfer to her office a second time after five students made separate and consistent statements that she had illegal drugs. Although the initial search had not turned up drugs, Principal Aguilar had reason to suspect that Jennyfer might have possessed or used them, and might still be possessing them. This was a serious situation, requiring immediate and decisive action. The school officials were justified in requiring Jennyfer to stay in the office for three hours, as rumors of the presence of drugs would likely cause commotion and disrupt the learning environment had she been allowed to return to class. In addition, requiring Jennyfer to forego her normal classes was a reasonable disciplinary measure, to impress upon her that drug possession and use are a serious matter requiring a deviation from normal daily activities. *See Smith v. McGlothlin*, 119 F.3d 786, 788 (9th Cir.1997) (no constitutional violation resulted from school officials' two-hour search of students caught smoking, since "a student is required to be on school premises, subject to the direction of the school authorities, during the course of the schoolday.").

The Court's conclusion regarding the reasonableness of Jennyfer's detention is supported by *Hassan*. In that case, the Fifth Circuit addressed a sixth-grade student's claim that he had been subjected to unreasonable seizure when school officials took him to a separate room and made him stay there, apart from the other students, for approximately fifty minutes after he was disruptive during a school field trip to a detention facility for juveniles. *Hassan*, 55 F.3d at 1078. The Fifth Circuit held that school officials were justified in placing him in the room because of the need to protect the safety of other students on the

trip and promote "a disciplined attitude." *Id.* at 1080. The need for safety and discipline were heightened, the Fifth Circuit said, because the detention center contained youths awaiting adjudication for criminal offenses, or living at the center following such adjudication. *Id.* The Fifth Circuit concluded that the detention was a reasonable way for school officials to maintain discipline and to "mak[e] it possible for the other students to continue their valuable educational experience." *Id.*

Also on point is *Milligan v. City of Slidell,* 226 F.3d 652 (5th Cir.2000). In that case, the Fifth Circuit rejected students' claims that school officials violated their Fourth Amendment rights by pulling them out of class to question them about rumors that a fight was going to take place after school. *Milligan,* 226 F.3d at 655–56. A previous fight had occurred among several of the plaintiffs, who attended Salmen High School, and two students who attended Slidell High School. *Id.* at 653. Two days later, the Slidell students' father was told by another student that a retaliatory fight, possibly including weapons, was to take place after school that day at Slidell High School, and that some people were "going to jump" the Slidell students. *Id.* After the students' father contacted Salmen High School officials, the Salmen High School Vice Principal called the plaintiffs out of class and questioned them for between ten and fifteen minutes about the fight. *Id.*

The Fifth Circuit held that the questioning did not constitute a Fourth Amendment violation. Although it assumed that the students had some Fourth Amendment privacy right "at a low level" not to be summoned to or detained in a school official's office for questioning on matters of school discipline, the Fifth Circuit held that the right was outweighed by school officials' need "to foster self-discipline and to deter possibly violent misconduct." *Id.*

at 655. The Fifth Circuit rejected the notion that school officials were required to use the least intrusive means to protect their interests, and held that school officials' questioning was justified in light of students' decreased expectation of privacy during school hours. *Id.* at 655–56.

Like the detentions in *Hassan* and *Milligan,* the Sierra Vista officials' detention of Jennyfer was justified by the need to maintain order, prevent disruption of other students' educational experience, and impose discipline. Drug possession and use, like rowdy behavior on a field trip or an after-school fight, can seriously disrupt the educational process. In this case, such disruptions were especially likely in light of the fact that, even before Jennyfer was searched, the girls' restroom erupted in commotion and had to be cleared due to her alleged drug possession and attempted use. Even if Jennyfer no longer had any drugs in her possession, rumors that she had possessed them earlier and had tried to use them were circulating through the school, and threatening to disrupt the classroom. In addition to potential disruptions, drug possession and use could cause physical harm to Jennyfer and any student who might obtain drugs from her. Thus, the school officials were justified in responding to a potentially disruptive and threatening situation by isolating her from the other students and from her normal activities. In short, Jennyfer's detention was "within the range of discretion accorded school officials and ... bore a rational relationship to the goal of providing a valuable and safe educational experience for the other ... children" at Jennyfer's school. *Hassan,* 55 F.3d at 1081.

The detention of Jennyfer in Principal Aguilar's office was also reasonable in scope. Plaintiffs do not allege that school officials forced Jennyfer to remain in the office except during the period between

the other students' reports and the time Jennyfer's mother arrived. She was detained only as long as was necessary to question her and keep her safe and out of class until school officials could confer with her and her mother. Jennyfer was never handcuffed or physically restrained, nor was she subjected to any verbal abuse or mistreatment. She remained at all times under adult supervision and protection. *See Hassan*, 55 F.3d at 1081 (no constitutional violation was "inherent" in student's detention at juvenile disciplinary center intake room where the student was not physically restrained, and remained under adult supervision and protection).

## C. State Law Claims

██ Jennyfer and Ms. Ramirez also assert claims for negligence and negligent and intentional infliction of emotional distress under state law. These claims also fail, as there is no evidence that Defendants' conduct fell below a standard of ordinary care or constituted extreme or outrageous behavior. *See Burnett v. Chimney Sweep*, 123 Cal.App.4th 1057, 1068–69, 20 Cal.Rptr.3d 562 (2004) (*citing Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 156 Cal.Rptr. 198, 595 P.2d 975 (1979) (one element of the cause of action for intentional infliction of emotional distress is extreme and outrageous conduct by the defendant)); *Gu v. BMW of North America, LLC*, 132 Cal.App.4th 195, 204, 33 Cal.Rptr.3d 617 (2005) (in California, negligent infliction of emotional distress is not an independent tort but rather a type of negligence.); *Wikberg v. Olson Co.*, 138 Cal. 479, 71 P. 511, 512 (1903) (courts may find that no negligence exists as a matter of law "where the facts are without dispute, or the deduction inevitably that of no negligence."). Indeed, Jennyfer admitted in her deposition that school officials did nothing especially bothersome or surprising when they questioned her, other than accusing her of something she claims she did not do and making her stay in the office for "a long time." (Bravo Depo., 85: 3–13; Exh. L to Bakshandeh Decl., 86: 6–11.) Far from negligent, the school officials' search and detention of Jennyfer were perfectly in line with what competent school officials would do upon receiving reports that a twelve-year old student was in possession of illegal drugs.

## IV. CONCLUSION

School officials at Sierra Vista handled this very serious incident reasonably and appropriately. They should be commended for attempting to maintain a safe and positive learning environment at Sierra Vista. It is ironic and unfortunate that they were dragged into federal court and required to defend themselves against a civil rights lawsuit for simply doing their duty. Hopefully, Defendants will find some solace in the fact that they do not have to defend themselves in this action any longer. Their motion for summary judgment is GRANTED.

IT IS SO ORDERED.