GRAVES, Circuit Judge,
dissenting.
I disagree with the majority’s finding that high school students have no clearly established rights under the Fourteenth and Fourth Amendments. Because I would affirm the district court’s denial of qualified immunity to coaches Cassandra Newell and Rhonda Fletcher, I respectfully dissent.
Factual History
S.W. was a 16-year-old softball player at Kilgore High School (KHS) in Texas. S.W., who had told only a few friends that she was gay, became involved in a relationship with 18-year-old Hillary Nutt. The softball coaches, Newell and Fletcher, claimed that they had heard a rumor[1] that S.W. had told someone she was involved in *511 a relationship with Nutt and that Nutt was Newell’s ex-girlfriend. Newell is gay and admitted in her deposition that Nutt started attending softball games after being invited by Newell’s former girlfriend.
Upon hearing this rumor, the coaches decided to confront S.W. They arranged an off-campus meeting after school on March 3, 2009. During this meeting, the coaches locked S.W. in the softball locker room and aggressively questioned her at length about her relationship with Nutt, her sexual orientation, and whether she had told anyone about Newell’s alleged relationship with Nutt. S.W. indicated that she was afraid and sat on a beanbag chair with her arms wrapped around her knees, while the coaches sat on their knees. At one point, Fletcher raised up, towering over S.W., and yelled at her. Fletcher asked S.W. if she was having a relationship with Nutt. While S.W. did say in her deposition that the coaches did not use the word “lesbian,” she said in her declaration that they asked if she was gay. S.W. also said that the coaches got very angry, repeatedly called her a “liar,” threatened her, and made intimidating gestures to the point that she thought Fletcher might hit her.
The coaches then called S.W.’s mother, Barbara Wyatt, arranged a meeting with her a short time later, and disclosed to her that S.W. was having an inappropriate relationship with another female. The coaches also revealed the identity of S.W.’s “girlfriend” to Wyatt, who was unaware that S.W. was gay.[2] Wyatt testified in her deposition that, although she had suspected that S.W. may be gay, S.W. had always denied it to her.
The coaches then refused to discuss the matter further. S.W. was later removed from the softball team. Wyatt attempted to resolve the situation through school officials and then by filing official complaints, which were denied. Subsequently, Wyatt filed an action in district court, asserting that the coaches violated S.W.’s privacy rights under the Fourth and Fourteenth Amendments and under the Texas Constitution. The coaches filed a motion for summary judgment on the basis of qualified immunity. The district court denied the motion, and the coaches filed an interlocutory appeal. The majority states that Wyatt’s claim has “become ever more nuanced” and that her “claim is now that she inferred S.W.’s sexual orientation from the coaches’ comments.” In fact, Wyatt has consistently maintained that the coaches told her S.W. was dating a girl and characterized Nutt as S.W.’s “girlfriend.”
Standard of Review
As correctly stated by the majority, this court reviews de novo a district court’s *512 denial of a motion for summary judgment on the basis of qualified immunity. Kova-cic v. Villarreal, 628 F.3d 209, 211 (5th Cir.2010). “The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a). The denial of a motion for summary judgment on the basis of qualified immunity is immediately appealable, to the extent that it turns on an issue of law. Kovacic, 628 F.3d at 211. The limitation of the interlocutory appellate jurisdiction to questions of law prohibits this court’s consideration of the correctness of plaintiffs version of the facts. Good v. Curtis, 601 F.3d 393, 397 (5th Cir.2010).
This means that the district court’s finding that a genuine factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal. But the district court’s determination that a particular dispute is material is a renewable legal determination. Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal.
Id. at 397-98. (Internal marks, citations and emphasis omitted).
The majority erroneously fails to concede the best view of the facts to the plaintiff, apparently under this Court’s authority to decide whether the factual disputes are material to deciding the summary judgment. Wagner v. Bay City, 227 F.3d 316, 320 (5th Cir.2000). While it is correct that we can review the materiality of factual disputes, we must keep in mind what this Court said in the excessive force case of Wagner. There, this Court said:
In deciding an interlocutory appeal of a denial of qualified immunity, we can review the materiality of any factual disputes, but not their genuineness. See Colston v. Barnhart, 146 F.3d 282, 284 (5th Cir.) (on petition for rehearing en banc), cert, denied, 525 U.S. 1054, 119 S.Ct. 618, 142 L.Ed.2d 557 (1998). So, we review the complaint and record to determine whether, assuming that all of Wagner’s factual assertions are true, those facts are materially sufficient to establish that defendants acted in an objectively unreasonable manner. Even where, as here, the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiffs version of the facts is true, then determine whether those facts suffice for a claim of excessive force under these circumstances.
Wagner, 227 F.3d at 320. Rather than weigh Wyatt’s version of the facts and compare it to the coaches’ version, this Court must decide whether the facts as presented by Wyatt are materially sufficient to establish that the coaches acted in an objectively unreasonable manner.
Qualified Immunity
When a defendant moves for summary judgment on the basis of qualified immunity, the court must decide: 1) Whether the facts made out a violation of a constitutional right; and 2) whether that right was “clearly established” at the time of the defendant’s alleged misconduct so that a reasonable official in the defendant’s situation would have understood that his conduct violated that right. See Ontiveros v. City of Rosenberg, Tex., 564 F.3d 379 (5th Cir.2009). See also Brewer v. Wilkinson, 3 F.3d 816 (5th Cir.1993).
Right of Privacy
With regard to the Fourteenth Amendment right to privacy violation, the district *513 court found that there is a constitutional right to prevent the unauthorized disclosure of one’s sexual orientation, and cites various cases from this Circuit and beyond in support of such a proposition. I agree with the district court’s analysis.
The majority acknowledges that the United States Supreme Court has recognized an individual interest in avoiding the disclosure of personal matters, but then finds that Wyatt has failed to allege a clearly established constitutional right. There is no dispute that one’s sexual orientation is a personal matter. The majority attempts to distinguish the cases cited by the district court and Wyatt on the basis that none occurred in the school context. However, the majority ultimately concedes that individuals have a privacy interest in personal sexual matters. See Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). See also Fadjo v. Coon, 633 F.2d 1172 (5th Cir.1981), and ACLU v. State of Miss., 911 F.2d 1066, 1070 (5th Cir.1990). But, as discussed more fully herein, the majority then finds that any such right does not extend to high school students.
At least five other circuits have recognized a right of privacy regarding personal sexual matters. See Sterling v. Borough of Minersville, 232 F.3d 190, 196 (3d Cir. 2000) (“It is difficult to imagine a more private matter than one’s sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity.”)(“We can, therefore, readily conclude that Wayman’s sexual orientation was an intimate aspect of his personality entitled to privacy protection under Whalen.”)] Powell v. Schriver, 175 F.3d 107, 111 (2nd Cir.1999) (“We conclude that the reasoning that supports the holding in Doe compels the conclusion that the Constitution does indeed protect the right to maintain the confidentiality of one’s transsexualism.”); Bloch v. Ribar, 156 F.3d 673, 685-86 (6th Cir.1998) (“Our sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood. Publically revealing information regarding these interests exposes an aspect of our lives that we regard as highly personal and private. Indeed, for many of these reasons, a number of our sister circuits have concluded that information regarding private sexual matters warrants constitutional protection against public dissemination.”); and Thome v. City of El Segundo, 726 F.2d 459, 468 (9th Cir.1983) (“The interests Thorne raises in the privacy of her sexual activities are within the zone protected by the constitution. This conclusion follows from the cases holding that such basic matters as contraception, abortion, marriage, and family life are protected by the constitution from unwarranted government intrusion.”); and Eastwood v. Dept. of Corrections, 846 F.2d 627, 631 (10th Cir.1988) (“As in Thorne, plaintiff in the instant case was forced to answer a number of irrelevant and embarrassing questions.... Indications of a victim’s promiscuity are not probative of either credibility or consent to sexual advances. ... Nor should such an inquiry be sanctioned in this case.”). While this authority may not be controlling, it is certainly persuasive.
Significantly, the majority fails to provide any authority for its finding that the right to privacy in personal sexual matters does not extend to high school students. To the contrary, the Supreme Court has found that the constitutional right to privacy extends to minors. See Application of Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The question is then whether minors lose that right upon entering the schoolhouse gate. The only cases cited by the majority, albeit in the Fourth Amendment analysis, regarding high *514 school students do not support the majority’s finding that the right to privacy does not extend to high school students. See Vernonia School District 47J v. Acton, 515 U.S. 646, 655-56, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) and Milligan v. City of Slidell, 226 F.3d 652, 654-55 (5th Cir.2000), discussed more fully herein.
Based on the applicable case law set out above, there clearly exists a right to privacy regarding one’s sexual orientation. The findings of the United States Supreme Court and six Circuit Courts of Appeal (including the 5th) that information of a sexual nature is intrinsically private is more than a “simple and unsurprising proposition.” Additionally, the school context does not defeat the very existence of a right, but rather comes into play with regard to a balancing test and whether the government’s interest outweighs a student’s privacy right. “Thus, while children assuredly do not ‘shed their constitutional rights ... at the schoolhouse gate,’ the nature of those rights is what is appropriate for children in school.” Vernonia, 515 U.S. at 655-56, 115 S.Ct. 2386 (internal citations omitted). Based on the applicable authority and the coaches’ own admissions that they recognized the private nature of the information, the district court is absolutely correct that sexual orientation would fall within the categories of highly personal information protected by the right to privacy. The district court correctly held that, while the 5th Circuit has never explicitly held that a student has a right to privacy in keeping his or her sexual orientation confidential, an analysis of precedent compels the finding of such a right.
The question then becomes whether the coaches had a legitimate interest which outweighed S.W.’s right to privacy. See Fadjo, 633 F.2d at 1176. See also Vernonia, 515 U.S. at 656-57, 115 S.Ct. 2386. The majority does not reach this balancing test, finding that consideration of the objectively reasonable prong of qualified immunity is unnecessary. However, this prong is necessary to determine whether the coaches’ interests outweigh a student’s right to privacy.
In support of a legitimate State interest, the coaches assert various reasons, including the possible sexual assault of a minor under Texas statute, Nutt being a bad influence, a violation of rules for S.W. riding with Nutt, and team discipline. Both the law and the facts undermine the legitimacy of the reasons given by the coaches. The Texas statute referred to by the majority specifically provides an affirmative defense because S.W. was over 14 and there was only two-years age difference between S.W. and Nutt. Thus, there was likely no valid legal concern regarding sexual assault.
With regard to Nutt being a bad influence',' after indicating during her deposition that she did not know of Nutt ever doing drugs, S.W. was asked, “[y]ou don’t know whether or not Hillary Nutt has ever taken a sip of alcohol?” S.W. responded that she knew Nutt had taken a drink but never in her presence. Also, S.W. was not asked if she knew where Nutt had taken that “sip of alcohol” or the applicable drinking age of the location. Further, Coach Newell testified a resounding “No” when asked during her deposition, “So, just to clarify, did you consider Hillary Nutt, the woman that your girlfriend invited to see your team members play, to be a threat to any of your — any of the players on your team ever?” Thus, there is no indication that Nutt was “potentially dangerous” or an “underage user of illegal drugs and alcohol.”
The claim of S.W. violating a team rule for riding with Nutt is also unsupported by the facts. The team.rule involves a per *515 mission slip that pertains to, inter alia, in-school transportation by other softball players between 6th and 7th periods for practice. Nutt was not listed on the permission slip. However, the permission slip does not regulate riding with anyone outside of softball. To construe this permission slip to apply to drivers not on the softball team is erroneous and would mean that neither Wyatt nor S.W.’s grandmother would have ever been able to transport S.W. because neither are listed on the permission slip. Yet, the coaches repeatedly said both Wyatt and the grandmother could also transport S.W.
As to team dissension caused by rumors of S.W.’s involvement with Nutt, we are, again, bound by S.W.’s facts — that she did not spread any rumors. Further, the coaches could not have known of any alleged dissension as this alleged “rumor” did not come to light until March 3, the day the coaches interrogated S.W. and revealed her sexual orientation to her mother. But the coaches dismissed the rest of the softball team prior to the “meeting” with S.W. Also, the allegation regarding dissension emanates from the coaches’ version of the facts.
More importantly, the only thing the coaches knew prior to interrogating S.W. was a rumor that she had allegedly told someone that she was in a relationship with Nutt and that Nutt was Newell’s ex-girlfriend. There was no evidence that S.W. was actually in a relationship with Nutt, that it was a sexual relationship, that S.W. lied about anything or had ever ridden with Nutt. The coaches did not find out that S.W. was actually involved in a relationship, albeit apparently never sexual, with Nutt until they interrogated S.W. The record indicates that the coaches also did not find out that S.W. was riding with Nutt until after they met with S.W. Moreover, Fletcher admitted as much in her deposition when she testified that the coaches called Wyatt to the field because they wanted her to help stop the spreading of rumors about Newell and because S.W. was “dating” an “adult.”
The district court fully considered all of the above and found that there was sufficient evidence from which a reasonable person could conclude that the coaches were not motivated by the need to protect S.W. but rather were retaliating against S.W. for allegedly spreading a rumor about Newell. The State has no interest in retaliating against students. As the district court found, even if the coaches were motivated by a desire to protect S.W., Wyatt provided expert testimony that the coaches’ actions “were not a reasonable response to any potential concerns they may have had regarding S.W. or her welfare.” The district court further found that, based on the record, it could not find that the States’ interest outweighed S.W.’s right to keep her sexual orientation confidential, and that S.W.’s rights were clearly established at the time. The district court also found that there were substantial unresolved questions of fact surrounding the circumstances leading up to the confrontation and the content of the coaches conversation with Wyatt that prevent it from making a qualified immunity determination. “Without a factual determination by the appropriate trier of fact, this Court cannot resolve the legal question as to whether the Defendants’ actions are amenable to a qualified immunity defense on this claim,” concluded the district court. I agree.
Unreasonable Seizure
With regard to the Fourth Amendment claim based on the confrontation in the locker room, the majority says that the district court overlooked case law that establishes that the Fourth Amendment ap *516 plies differently in the school context and particularly with regard to student athletes in locker rooms. Again, the majority cites Vernonia, 515 U.S. 646, 115 S.Ct. 2386, and Milligan, 226 F.3d 652, for the diminished expectation of privacy of school children, particularly student athletes. However, neither case supports any such finding.
Vernonia was a case involving random urinalysis drug testing of student athletes. The majority cites this case for the proposition that athletes have less privacy expectations and that locker rooms are “not notable for the [Fourth Amendment] privacy they afford.” Vernonia, 515 U.S. at 657, 115 S.Ct. 2386.[3] But those propositions have absolutely nothing to do with the instant case. The Supreme Court specifically said:
While we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional “duty to protect,” we have acknowledged that for many purposes “school authorities ac[t] in loco parentis,” with the power and indeed the duty to “inculcate the habits and manners of civility,” Thus, while children assuredly do not “shed their constitutional rights ... at the schoolhouse gate,” the nature of those rights is what is appropriate for children in school.
Vernonia, 515 U.S. at 655, 115 S.Ct. 2386. (Internal citations, marks omitted). The Court further said:
Legitimate privacy expectations are even less with regard to student athletes. School sports are not for the bashful. They require “suiting up” before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford. The locker rooms in Vernonia are typical: No individual dressing rooms are provided; shower heads are lined up along a wall, unsepa-rated by any sort of partition or curtain; not even all the toilet stalls have doors. As the United States Court of Appeals for the Seventh Circuit has noted, there is “an element of ‘communal undress’ inherent in athletic participation.”
Vernonia, 515 U.S. at 657, 115 S.Ct. 2386. (Internal citations omitted). This case has nothing to do with physical privacy in a locker room or even compliance with established rules such as random drug testing. That said, even conceding a diminished expectation of privacy, the Court’s further analysis regarding random drug testing is telling:
Having considered the scope of the legitimate expectation of privacy at issue here, we turn next to the character of the intrusion that is complained of. We recognized in Skinner that collecting the samples for urinalysis intrudes upon “an excretory function traditionally shielded by great privacy.” We noted, however, that the degree of intrusion depends upon the manner in which production of the urine sample is monitored.... These conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily. Under such conditions, the privacy interests compromised by the process of obtaining *517 the urine sample are in our view negligible.
The other privacy-invasive aspect of urinalysis is, of course, the information it discloses concerning the state of the subject’s body, and the materials he has ingested. In this regard it is significant that the tests at issue here look only for drugs, and not for whether the student is, for example, epileptic, pregnant, or diabetic. Moreover, the drugs for which the samples are screened are standard, and do not vary according to the identity of the student. And finally, the results of the tests are disclosed only to a limited class of school personnel who have a need to know; and they are not turned over to law enforcement authorities or used for any internal disciplinary function.
Vernonia, 515 U.S. at 658, 115 S.Ct. 2386. (Internal citations omitted).[4]
Here, there was no policy regarding lesbian relationships. In fact, at least one of the coaches and other members of the softball team were gay. Newell testified in her deposition that she had not made efforts to find out about other players’ relationships and had never informed any other parents of who their children were dating. The results of the interrogation were not disclosed only to a limited class of school personnel who had a need to know, but were instead turned over to S.W.’s mother.
The Fourth Amendment claim involves the coaches’ locking S.W. in the locker room and confronting her — not the invasion of privacy under the Fourteenth Amendment which involved the disclosure of her sexual orientation to her mother. Therefore, the majority incorrectly finds that the district court overlooked case law. Further, the majority finds that verbal abuse does not give rise to a constitutional violation under 42 U.S.C. § 1983, and, “thus, there is simply no clearly established constitutional right.” Again, the majority errs. The case cited by the majority, Calhoun v. Hargrove, 312 F.3d 730, 734 (5th Cir.2002), for the proposition that verbal abuse does not give rise to a constitutional violation under 42 U.S.C. § 1983 actually says:
A claim for relief under § 1983 must allege the deprivation of a right secured by the Constitution or the laws of the United States by a defendant acting under color of state law. Wong v. Stripling, 881 F.2d 200, 202 (5th Cir.1989). Furthermore, under 42 U.S.C. § 1997e(e), “[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.”
Calhoun, 312 F.3d at 734.
This is not a suit by a prisoner and there is no applicable federal statute requiring physical injury. Notwithstanding the inapplicability of Calhoun[5], verbal abuse is only one of the actions cited by Wyatt. The others included locking S.W. in the *518 locker room, interrogating her, intimidating gestures, etc. Under the same authority as the Fourteenth Amendment analysis above, there clearly exists a Fourth Amendment right against unreasonable seizure/false imprisonment. The majority ignores the balancing test which is required to determine whether the State’s interest outweighs S.W.’s right against unreasonable seizure. Instead, the majority presumably finds that such a right does not clearly exist for high school students and, thus, there is no need to determine objective reasonableness. I disagree. As stated previously, school children do not shed their constitutional rights at the schoolhouse gate. The majority fails to cite any authority to indicate that the Fourth Amendment right to be free from unreasonable seizure does not extend to high school students. A consideration of the objectively reasonable prong is necessary.
For the same reasons stated in the Fourteenth Amendment right to privacy discussion, I would conclude that there are genuine issues of material fact and that summary judgment was correctly denied.
Conclusion
Accordingly, I would find that Wyatt has alleged clearly established constitutional rights and that there are genuine issues of material fact sufficient to warrant denial of summary judgment on the basis of qualified immunity. Because I would affirm the district court, I respectfully dissent.

. The majority erroneously states that S.W. admitted to starting a rumor. S.W. did not admit to starting any rumor. S.W. admitted to having a "private conversation with one person” after that person pressed S.W. for an opinion on Newell’s sexuality. Further, there is no dispute that Newell is gay and brought *511 her girlfriend to softball games. With regard to extraneous "facts,” S.W. did not admit to "routinely showing up late and using profanity at practice.” S.W. admitted to being required to run for being late and/or using profanity when she accidentally hit herself in the kneecap with a bat "maybe two or three” times in 2009, which is the time period in question. However, there is absolutely no claim by the coaches that they met with Wyatt to discuss S.W. being late or using profanity, minor team infractions for which S.W. had already been punished along with other players.

. Contrary to the majority's statement in footnote 4 regarding "undisputed” facts, while S.W. admitted that she had confided in some friends regarding her sexual orientation, it is undisputed that she had never told her mother. With regard to "skipping down the hallway holding hands,” S.W. was asked during her deposition if she had "ever held hands in the hallway with a girl.” S.W. responded that she and two other girls had held hands and skipped down the hallway, but clarified twice that it was nothing homosexual. The clothing representing "society’s symbol for gay pride” was a belt with studs on it forming the shape of a rainbow that S.W. had worn twice over a few-months' time.

. The majority asserts that the seizure behind locked doors was proper because, by choosing to be a student athlete, S.W. subjected herself to a higher degree of regulation, but then cites Milligan for the proposition that actually being a student athlete has nothing to do with it. I note that Milligan involved questioning of students by police officers regarding possible illegal acts, i.e., fights involving weapons.

. The Court further addressed the provision of the drug testing policy that required students to identify prescription medications in advance if they wanted to avoid sanctions for a false positive drug test.

. Notably, while dismissing as uncontrolling the abundant authority from other circuits that supports Wyatt’s position, the majority attempts to also rely on Doe v. Gooden, 214 F.3d 952, 955 (8th Cir.2000), and Walker-Serrano by Walker v. Leonard, 168 F.Supp.2d 332, 347 (M.D.Pa.2001), for its proposition that verbal abuse does not give rise to a constitutional violation. In Gooden, the Eighth Circuit found that the teacher's statements did not amount to a constitutional violation, but did not foreclose the possibility of such, saying: "Verbal abuse is normally not a constitutional violation.” 214 F.3d at 955. In Walker, the Pennsylvania district court cited Gooden for the proposition that "verbal *518 abuse, whether coming from a student or a teacher, is not a constitutional violation.” Walker, 168 F.Supp.2d at 348. However, Gooden does not say that. Gooden, 214 F.3d at 955. Further, Walker was a First Amendment case involving an elementary student’s petition against a school field trip to a circus. The plaintiff also claimed emotional distress for teasing from other students after she and her mother boycotted the field trip and protested outside the circus. Importantly, the district court repeatedly indicated that elementary students do not enjoy the same clearly established rights as high school students.